THOMAS A. JOSEPH, THOMAS J. JOSEPH, ACUMARK, INC., AIRPORT LIMOUSINE AND TAXI SERVICE, INC, AND AIRPORT TAXI, LIMOUSINE AND COURIER SERVICE OF LEHIGH VALLEY, INC.
v.
THE SCRANTON TIMES L.P., THE TIMES PARTNER, EDWARD J. LYNETT, JR., GEORGE V. LYNETT AND CECELIA LYNETT HAGGERTY, THE SCRANTON TIMES, INC., SHAMROCK COMMUNICATIONS, INC., ZYXW, INC., JAMES CONMY AND EDWARD LEWIS
PETITION OF: THE SCRANTON TIMES L.P., THE TIMES PARTNER AND EDWARD LEWIS
No. 19 MM 2009.
Supreme Court of Pennsylvania, Middle District.
November 4, 2009.

ORDER
PER CURIAM.
AND NOW, this 4th day of November, 2009, this Court having assumed plenary jurisdiction over this case by order dated April 7, 2009; and having specially appointed the Honorable William H. Platt, President Judge of the Court of Common Pleas of Lehigh County, to preside over a remand of this matter; and the Court having received and considered the Report and Recommendation of President Judge Platt, as well as the Exceptions of Respondents, the Petitioners' Reply to the Exceptions, and the Respondents' Reply to the Response of Petitioners, treated as a Sur-Reply, it is hereby ORDERED as follows:
(1) Respondents request that we decline to adopt President Judge Platt's recommendation that Petitioners be granted a new trial. Respondents assert that we should "decline the recommendations contained in the Report that, admittedly or not, are grounded upon [Robert] Kulick's hearsay allegations and unsustainable on the evidence in the record[.]" Exceptions at 50. Kulick, a convicted felon, testified at the remand hearing before President Judge Platt. Respondents reference that portion of Kulick's testimony in which he reported that, while this case was pending before former Judge Mark A. Ciavarella for bench trial, former President Judge Michael T. Conahan made comments to convicted felon William D'Elia, which D'Elia related to Kulick, that Petitioners would prevail. Respondents assert that this testimony constituted inadmissible hearsay. Furthermore, Respondents assert that it is critical to resolve this hearsay issue because, without this portion of Kulick's testimony, President Judge Platt's recommendation that a new trial be granted lacks adequate record support. It is noted, however, that President Judge Platt explicitly stated that, even if he had found that those portions of Kulick's testimony were inadmissible hearsay, there was sufficient independent evidence of judicial impropriety concerning the assignment and trial of this case that his recommendation would have remained the same. See Report at 29 n.8.
Under our April 7, 2009 order exercising jurisdiction, President Judge Platt was authorized to recommend a new trial if he determined that Petitioners established that there was "an appearance of impropriety in either the assignment or trial of this case." The Pennsylvania Constitution directs that the courts shall provide remedies "by due course of law, and right and justice [are to be] administered without sale, denial or delay." PA.CONST. art. I, § 11. Article V empowers this Court with "general supervisory and administrative authority over all the courts and justices of the peace ...." PA. CONST. art V, § 19(a). This Court previously has recognized that even the "appearance of impropriety is sufficient justification for the grant of new proceedings before another judge . . . . A jurist's impartiality is called into question whenever there are factors or circumstances that may reasonably question the jurist's impartiality in the matter." In Interest of McFall, 617 A.2d 707, 712-13 (Pa. 1992). The McFall Court further explained that, "[a] tribunal is either fair or unfair. There is no need to find actual prejudice, but rather, the appearance of prejudice is sufficient to warrant the grant of new proceedings. A trial judge should not only avoid impropriety but must also avoid the appearance of impropriety." Id. at 114. Notably, in McFall, this Court stressed that it was not relying "on the United States Constitution or federal case law," id. at 714 n.6, in enforcing these precepts. Similarly, we made clear that the award of new proceedings in McFall was not predicated on a finding of a due process violation. Id. at 712. McFall proceeded as an exercise of this Court's inherent constitutional powers governing judicial administration. See PA. CONST. art V, § 19(a).
Having independently reviewed the record and the parties' filings, we now agree with President Judge Platt that the evidence of record independent of Kulick's alleged hearsay statements amply demonstrated that the assignment and the trial of this case was infected with the appearance of judicial impropriety such that a new trial must be granted. Accordingly, in the interest of justice, and in the exercise of our constitutional powers of supervision of the lower courts, we adopt President Judge Platt's recommendation of a new trial, to remedy the pervasive appearance of impropriety in this case, and to give justice, and the appearance of justice, an opportunity to prevail.
Petitioners adequately demonstrated that, in response to Petitioners' repeatedly voiced concerns that Respondents were judge-shopping to have Ciavarella assigned to preside over this matter, both Conahan and Ciavarella reassured Petitioners that the case would be assigned randomly for trial. The evidence adduced at the hearing, however, showed these reassurances to be misleading, or even plainly false, as such random assignment did not occur as a matter of course in Luzerne County at that time, and certainly did not occur in this case. Indeed, the manner in which Ciavarella was assigned to preside over this case was so unusual that the long-time Luzerne County Deputy Administrator of Civil Trials noted on the docket that Conahan and William Sharkey, the former Court Administrator for Luzerne County, who is Conahan's cousin (Sharkey has since resigned in the wake of federal corruption charges), had hand-assigned the case. The Deputy Administrator stated that she was motivated to make this unusual notation because she wanted to afford herself some protection.
In matters affecting core precepts such as both the appearance and the actuality of fair tribunals, no ultimate supervisory authority, such as this Court, can indulge an invitation to be deliberately obtuse. Conahan and Ciavarella were confederates in what appears to have been (by Ciavarella's own admissions here) a long-term criminal conspiracy. The judicial officers also positioned themselves and others (such as Sharkey) within the Luzerne County court system so that they could control the assignment and trial of individual cases, if they were inclined to do so. And there was direct evidence that the assignment of this case to Ciavarella was controlled by Conahan and was not in the ordinary course of business.
Furthermore, Conahan, who hand-selected Ciavarella to preside over this trial, carried on a long-term relationship with D'Elia, which included his accepting unmarked envelopes delivered to the courthouse by D'Elia via a courthouse employee, as well as his meeting regularly with D'Elia at a local restaurant where they would have what was described by witnesses as business papers spread on the table before them. Most strikingly, Conahan continued his meetings with D'Elia even after D'Elia's arrest by federal authorities, only moving those meetings to a less noticeable public parking lot. Both
Conahan, a judicial officer who was President Judge at the time of the assignment and trial of this case, and D'Elia, who apparently was cooperating with federal authorities in other investigations, declined to testify at the proceedings below to answer, much less refute, the central allegations concerning this matter that came to light. Sharkey likewise declined to testify.[1]
Ciavarella, however, did testify under oath at the hearing before President Judge Platt. Ciavarella detailed the conduct he and Conahan engaged in regarding the monetary payments they both had received from Robert Powell, Esq., a local lawyer who routinely appeared before them, in connection with the construction of two private juvenile detention facilities. Even accepting as true the obviously self-serving characterizations in Ciavarella's testimony, his account, at a minimum, showed that the relationship of those two former judges had an apparent central, criminal conspiratorial facet. Ciavarella also admitted that he intentionally did not reveal to any litigants appearing before him that he and Conahan were engaged in this highly lucrative, highly unethical, and apparently illegal venture, nor did he reveal his substantial financial connection to Powell, even in cases where Powell appeared in front of him. Ciavarella thus ensured that litigants who would have had a strong and obvious reason to seek his recusal would not learn of the facts that would occasion the motion. In short, Ciavarella was acutely aware of his compromised position as a judicial officer, and deliberately responded only by taking affirmative steps to cover his tracks, elevating his self-interest over his core judicial obligations.
It bears repeating: a jurist is either fair or unfair; there are no acceptable gradations. This case was assigned by Conahan, through Sharkey, to Ciavarella for trial. After rendering a series of evidentiary decisions against Petitioners, Ciavarella returned a bench trial verdict in favor of Respondents in the amount of $3.5 million. The inherently troubling nature of Conahan's and Ciavarella's compromised positions as jurists is enhanced, in this case, given that the subject matter of this defamation lawsuit concerned newspaper articles reporting on the undisputed fact of a federal criminal investigation into D'Elia's and Joseph's alleged ties to organized crime activities, an investigation which included search warrants for Joseph's home and businesses.
For these reasons, we conclude that President Judge Platt's finding that there was an appearance of judicial impropriety in the assignment and trial of this particular case, based on sufficient evidence of record independent of Kulick's testimony, is amply supported. Accordingly, we accept President Judge Platt's recommendation and order a new trial. This relief is awarded in the interest of justice, to remedy judicial impropriety, and is premised upon this Court's supervisory power over inferior tribunals. Respondents' request that this Court decline the recommended grant of a new trial is DENIED.
(2) Respondents request that we declare that the proper legal standard for Petitioners obtaining relief in this case is a showing of actual prejudice. Concomitantly, Respondents request that this Court "order a complete review of the evidentiary record and the trial transcript" to determine whether Petitioners did indeed suffer actual prejudice. Exceptions at 50. Actual prejudice is not the standard announced in McFall or the standard articulated in our April 7, 2009 order regarding the instant matter. Nor is actual prejudice an appropriate measure where the issue at hand involves the appearance of judicial impropriety. Because the appearance of judicial impropriety was established here, no showing of actual prejudice need be made. Respondents' request is DENIED.
(3) Based on the foregoing, we agree with President Judge Platt's recommendation that the verdict and judgment entered in the Joseph case "as well as all substantive orders" entered by Conahan and Ciavarella be vacated, and this matter returned to the Court of Common Pleas of Luzerne County for assignment to a new judge for a new trial.
(4) Petitioners did not file exceptions to President Judge Platt's recommendation that Petitioners should not be permitted to request a jury trial, as part of any appropriate award of relief, as Petitioners presented no evidence that their failure to request a jury trial in the first instance was in any manner influenced or affected by the conduct of Ciavarella or Conahan. Accordingly, we accept that unchallenged recommendation.
Case remanded to the Court of Common Pleas of Luzerne County for a new trial. Plenary jurisdiction is relinquished.
NOTES
[1] Obviously, we recognize that Conahan, D'Elia and Sharkey stood upon their Fifth Amendment right to avoid self-incrimination. Taking logical note of their positions here, however, for purposes of this Court's distinct supervisory inquiry into the appearance of impropriety in the assignment and trial of this case, does nothing to burden their constitutionally-based efforts to avoid additional criminal charges.