**In re Ann H. LOKUTA, Judge of the Court of Common Pleas, Eleventh Judicial District, Luzerne County.**

**No. 3 JD 06.**

Court of Judicial Discipline
of Pennsylvania.

Jan. 4, 2010.

Francis J. Puskas, II, Deputy Chief Counsel, Judicial Conduct Board, for the Judicial Conduct Board.

Ronald Vincent Santora, Forty Fort, George A. Michak, Harrisburg, for Respondent

1.  In our Opinion we referred to Judge Lokuta as "the Respondent." Since then she has filed a Petition with the Supreme Court and is referred to as "the Petitioner" by the Supreme Court in its Remand Order. We will refer to her as "the Petitioner."

2.  Four violations of Canon 3(A)(3) (failure to be patient, dignified and courteous); one violation of Canon 3A(5) (failure to dispose promptly of the business of the court); four violations of Canon 3(B)($l$) (failure to facili-

Before KURTZ, P.J., MUSMANNO, SPRAGUE, LAMB, P.J.E., O'TOOLE, STREIB, and BUCCI, JJ.

## OPINION AND ORDER

OPINION BY Judge SPRAGUE.

### I. *INTRODUCTION*

On October 30, 2008, after a lengthy trial, this Court filed an Opinion finding that Judge Ann H. Lokuta [1] was subject to discipline under Section 18(d)(1) of the Pennsylvania Constitution. That finding was based on findings that Petitioner's conduct described at the trial by 30 witnesses constituted thirteen violations of the Constitution as conduct which brought the judicial office into disrepute or prejudiced the proper administration of justice, or both, and also constituted thirteen violations of various provisions of the Code of Judicial Conduct.[2] We held that these violations had been established by "clear and convincing evidence." These findings of the Court were unanimous with the exception that Judges Streib and O'Toole did not join in the Court's findings that Petitioner violated Canons 3(C)(1)(a) and 2(A).

On December 9, 2008, this Court entered an Order of Sanction removing Petitioner from her judicial office and prohibiting her from holding any judicial office in the future.[3] From this Order, on January 6, 2009, Petitioner filed a timely appeal with the Supreme Court.

tate the performance of the administrative responsibility of other judges and court officials); two violations of Canon 3(C)($l$)(a) (failure to disqualify); and two violations of Canon 2A (failure to conduct herself in a manner that promotes public confidence in the integrity and impartiality of the judiciary).

3.  Judge O'Toole dissented from the Sanction Order and would have imposed a sanction of suspension for one year without pay followed by probation for three years.

On January 26, 2009, the United States Attorney for the Middle District of Pennsylvania filed an Information against Michael Conahan and Mark Ciavarella, former judges of the Luzerne County Court of Common Pleas, charging them with violations of 18 U.S.C. §§ 1343, 1346 and 2 which he styled—"Honest Services Wire Fraud" (Count 1), and with violations of 18 U.S.C. § 371 styled "Conspiracy to Defraud the United States" (for filing "materially false [income] tax returns") (Count 2).[4]

On February 3, 2009, the United States Attorney filed an Information against William T. Sharkey, former Court Administrator of Luzerne County, charging him with embezzling funds belonging to Luzerne County. Sharkey pled guilty to the charges on February 17, 2009.[5]

On February 23, 2009, Jill Moran, former Prothonotary of Luzerne County, entered into a Stipulation of Compromise with the United States of America whereunder she agreed to cooperate with the United States by providing all information of criminal activity of which she has knowledge and to resign as Prothonotary of Luzerne County.

On March 3, 2009, Petitioner filed an Application for Supersedeas, Stay, and Extraordinary Relief with the Supreme Court. In the Application, Petitioner made reference to the above-mentioned Informations and the guilty pleas of Conahan, Ciavarella and Sharkey and the Stipulation of Compromise filed by Moran and requested various relief including a stay of the Order of this Court removing her from judicial office.[6]

On March 25, 2009, the Supreme Court of Pennsylvania consolidated Petitioner's Application for Extraordinary Relief with her appeal and remanded the case to this Court in an Order which stated:

> The consolidated matter is REMANDED to the Court of Judicial Discipline for the limited purpose of that court considering Petitioner's claims in the nature of after-discovered evidence, arising from the recent revelations of corruption in Luzerne County. The Court of Judicial Discipline is to determine whether the new evidence requires a further hearing and/or whether it affects the existing determination of the Court of Judicial Discipline to remove Petitioner from judicial office.

> Furthermore, the December 9, 2008 order of the Court of Judicial Discipline is STAYED pending remand and a final determination of this matter.... [7]

---

**4.** Conahan and Ciavarella entered Plea Agreements to the charges on January 26, 2009 but, on July 30, 2009 Judge Kosik of the United States District Court for the Middle District of Pennsylvania withdrew approval of the Plea Agreements and Conahan and Ciavarella entered pleas of not guilty. Later, on September 9, 2009, the Grand Jury returned an Indictment alleging the same conduct, but charging Conahan and Ciavarella with a variety of additional crimes arising from that conduct. These include Racketeering, Corrupt Receipt of Bribe/Reward for Official Action Concerning Programs Receiving Federal Funds, Money Laundering, and Extortion Under Color of Official Right, consisting of a total of 48 Counts. Conahan and Ciavarella have pleaded not guilty to these charges.

**5.** Sharkey's conduct described in the Information is unrelated to the conduct which provided the basis for the charges against Conahan and Ciavarella.

**6.** Petitioner also requested that the Supreme Court direct the Secretary of the Commonwealth to refrain from placing Petitioner's judicial seat on the May 2009 ballot.

**7.** The Supreme Court's Order continued with instructions to the Secretary of the Commonwealth as follows:

> [A]nd the Secretary of the Commonwealth is directed to refrain from placing Petitioner's judicial seat on the Court of Common Pleas of Luzerne County on the May 2009

From this Order, then, we take instruction for our work on remand.

## II. *DISCUSSION*

### A. *Proceedings in This Court*

Pursuant to the Supreme Court's Remand Order, this Court proceeded as follows:

On March 27,2009 we ordered the Judicial Conduct Board (Board) and Petitioner to file briefs treating the questions:

1. whether the matters referred to by Petitioner in her Application to the Supreme Court ... require this Court to revoke or modify the sanction order removing Petitioner from her judicial office, and

2. whether a further evidentiary hearing is required to make such determination.

Briefs were filed in April and argument on the questions was held on May 13, 2009. During that argument, this Court made the following ruling:

It is the Opinion of this Court—the unanimous Opinion of this Court that the Remand Order by the Supreme Court of Pennsylvania where they use the language arising from the—reading it in its entirety—for us, this Court "for the limited purpose of considering Petitioner's claims in the nature of after discovered evidence arising from the recent revelations of corruption in Luzerne County," that that means we are not obviously told to look at newspaper accounts. We are not told to guess as to what in the world is meant by something that may be public, of something that may become public.

What the Supreme Court meant in the Opinion of this Court is that those filings that have been on the public record in Luzerne County, meaning the pleas of guilty by Judge Ciavarella, Judge Conahan, Mr. Sharkey, and even including the agreement involving Moran, but it is the position of this Court that all arguments are to be from those matters. That is what is meant by corruption.

It is our position that argument that we will hear, and if there is to be testimony, will be on the issue of the connection of that area of corruption and the trial of Judge Lokuta to see if there is anything that occurred in those areas that would cause this Court to reconsider its disposition of this case or the necessity of taking further testimony. (N.T. 45–46, May 13, 2009).

At the conclusion of the proceedings on May 13, 2009, this Court entered the following Order:

It is the ruling of this Court that no discovery will be allowed, which does not mean however that Judge Lokuta may not engage in whatever investigation they want to do and obtain whatever interviews and any other material they want to obtain.

The Court will grant Judge Lokuta a period of 90 days to engage in whatever discovery they believe appropriate understanding the ruling of this Court, and it is expected it will be complied with. (N.T. 95–96, May 13, 2009).

Thereafter, on August 7, 2009, Petitioner filed four documents. These were the affidavits of:

Patricia Benzi

primary ballot. This stay is entered solely for the purpose of ensuring that Petitioner's seat on the Court of Common Pleas of Luzerne County is not placed on the ballot until final resolution of this judicial disciplinary matter, and is not to be construed as this Court taking any position on the merits of Petitioner's appeal or her after-discovered evidence claim.

Joseph S. Novak
Carolee Medico Olenginski and
Sandra M. Brulo

On September 10, 2009 Petitioner filed a "Supplemental Statement" which was a letter from Judge Norman A. Krumenacker, III, Court of Common Pleas of Cambria County.

On October 7, 2009 Petitioner filed a "Supplemental Submission" which reports on two newspaper articles which appeared in the Wilkes–Barre papers on September 25, 2009 and October 2, 2009, and statements made by John Kennedy, a Luzerne County lawyer, on a Wilkes–Barre radio station on October 2,2009. The newspaper articles were attached as exhibits. In its Response to this Submission the Board filed a transcript of Kennedy's radio interview.

After consideration of the conduct of Conahan and Ciavarella and Sharkey set out in the Informations filed against them [8] and of the six items submitted by the Petitioner set out above, this Court entered an Order on October 27,2009 which provided:

1. the new evidence claim of Ann H. Lokuta, Petitioner, does not require a further hearing on the merits of this Court's Findings of Fact and Conclusions of Law contained in its Opinion of October 30, 2008.[9]

2. the Court, however, will permit Petitioner and the Judicial Conduct Board to present argument at a hearing as to whether the new evidence that has been presented to this Court affects the existing deter-

mination of this Court to remove Petitioner from judicial office.[10]

■ Argument on the question was held on November 17, 2009 and the Court now unanimously affirms paragraph 1. of its Order of October 27, 2009 that the new evidence claim of Ann H. Lokuta, Petitioner, does not require a further hearing on the merits of this Court's Findings of Fact and Conclusions of Law contained in its Opinion of October 30, 2008; and further holds that said new evidence does not affect the existing determination of this Court removing Petitioner from judicial office and prohibiting her from holding any judicial office in the future.

B. *Scope of Remand*

1. "New Evidence" and "After–Discovered Evidence."

The Petitioner has raised some questions about just what it is that the Supreme Court has instructed this Court to consider in making the determinations we were instructed to make in the Remand Order.

The answer to this seems very clear to us. The Supreme Court's Remand Order states that any determinations by this Court that a further hearing should be held or our sanction order changed are to be made only if *"the new evidence requires [it]."* We likewise believe that the Supreme Court has made it quite clear exactly what is this "new evidence" which it instructs us to consider. The Court tells us that it is "in the nature of *after-discovered evidence,* arising from the *recent reve-*

---

8. Moran's Stipulation of Compromise describes no conduct. It refers to "criminal activity" and provides that if she has knowledge of any, she will share it with the United States.

9. This finding was unanimous.

10. Judges O'Toole and Streib would have allowed an evidentiary hearing on the question of whether the new evidence affects the existing determination to remove Petitioner from judicial office.

*lations* of corruption in Luzerne County." We believe that the Supreme Court's choosing of the modifier "after-discovered" was made with thought and purposefully, first, because of the importance that there be an end to cases,[11] and because everybody knows what "after-discovered evidence" is, it having been defined over and over by the courts of the Commonwealth.

The Supreme Court has defined it, in *Commonwealth v. Dennis,* 552 Pa. 331, 355, 715 A.2d 404, 415 (1998), as follows:

To warrant relief after-discovered evidence must meet a four-prong test:

(1) the evidence could not have been obtained before the conclusion of the trial by reasonable diligence;

(2) the evidence is not merely corroborative or cumulative;

(3) the evidence will not be used solely for purposes of impeachment;

(4) the evidence is of such a nature and character that a different outcome is likely.

*See, also, Weir v. Ciao,* 364 Pa.Super. 490, 496, 528 A.2d 616, 619 (1987) *aff'd,* 521 Pa. 491, 556 A.2d 819 (1989); *Ebner v. Ewiak,* 335 Pa.Super. 372, 484 A.2d 180 (1984); *Gamma Swim Club, Inc. v. Commonwealth, Department of Transportation,* 95 Pa.Cmwlth. 167, 505 A.2d 342 (1986).

After-discovered evidence not only is defined in judicial decisions, there is legisla-

tion defining it. The Post–Conviction Relief Act (PCRA) provides:

§ 9543. Eligibility for Relief

(a) GENERAL RULE. To be eligible for relief [vacation of existing Order and grant of new trial], under this subsection the petitioner must plead and prove by a preponderance of the evidence all of the following:

\* \* \*

(2) That the conviction or sentence resulted from one or more of the following:

\* \* \*

(vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.

42 Pa.C.S. § 9543.

The Superior Court pertinently noted in *Commonwealth v. Moss,* 455 Pa.Super. 578, 584, 689 A.2d 259, 262 (1997), that § 9543 of the PCRA previously required that the "exculpatory evidence ... would have *affected* the outcome." The statute was amended effective January 16, 1992, to require that the evidence in question be of a quality which would have *"changed"* the outcome of the trial.

We will employ the Supreme Court's "four prong" test in our evaluation of the "new evidence" (i.e., The Informations against Conahan, Ciavarella and Sharkey as well as the six items submitted by Peti-

**11.** This has long been a jurisprudential staple in this Commonwealth and was announced with some noticeable emphasis by our Supreme Court in *Reilly by Reilly v. SEPTA,* 507 Pa. 204, 489 A.2d 1291 (1985). There the Supreme Court said:

Charges of prejudice or unfairness made after trial expose the trial bench to ridicule and litigants to the uncertain collateral attack of adjudications upon which they have placed their reliance. One of the strengths of our system of justice is that once deci-

sions are made by our tribunals, they are left undisturbed. Litigants are given their opportunity to present their cause and once that opportunity has passed, we are loathe to reopen the controversy for another airing, save for the greatest of need. This must be so for the security of the bench and the successful administration of justice. Accordingly, rules have developed for the overturning of verdicts and judgments for after-acquired evidence.

*Reilly* at 1301.

tioner) in our determination of whether it constitutes "after-discovered evidence."

## 2. "Recent Revelations of Corruption in Luzerne County."

■ It would seem to go without saying that the "recent revelations of corruption in Luzerne County" which the Supreme Court directed us to consider are—could only be—those revelations which had been revealed when the Supreme Court entered its Order of Remand (March 25, 2009). These revelations were the revelations contained in the Informations against Conahan and Ciavarella filed by the United States Attorney in the Middle District of Pennsylvania on January 26, 2009. The Information against Sharkey was filed on February 3, 2009.[12]

These revelations of corruption in Luzerne County consist of allegations [13] which relate that Conahan and Ciavarella devised and carried out "a material scheme and artifice to defraud the citizens of the Commonwealth of Pennsylvania and to deprive those citizens of their right to the honest services of Michael T. Conahan and Mark A. Ciavarella as judges of the Court of Common Pleas for Luzerne County." The Information also avers that Conahan and Ciavarella "abused their positions as judges of the Court of Common Pleas for Luzerne County by accepting compensation from individuals and organizations doing business with the Court." The Information goes on to describe the scheme as follows:

During 2000, Conahan and Ciavarella arranged for the construction of a new juvenile detention center in Luzerne County by a building contractor who was a friend of Ciavarella's. Conahan then, in January 2002, acting in his capacity as President Judge of Luzerne County, signed a "Placement Guarantee Agreement" under which the Court of Common Pleas of Luzerne County agreed to pay an annual rental installment of $1,314,000 to PA Childcare LLC for the housing of juveniles in the new detention center which was to be owned by PA Childcare. Under the Agreement, the obligation of the Court to pay the rental installments was "absolute and unconditional" Conahan, again acting in his capacity as President Judge of Luzerne County, took official action in December 2002, to remove funding from the Luzerne County budget for the existing Luzerne County juvenile detention center.

Due to the success of the new detention center in Luzerne County, another detention center, known as Western PA Childcare, was built in western Pennsylvania in 2005 by the same builder who built the new center in Luzerne County. Western PA Childcare was owned by the same individuals who owned PA Childcare. In 2006 the same builder built an addition to the Luzerne County center.

Beginning in February 2003, when the construction of the new detention center in Luzerne County was completed, Ciavarella, acting in his capacity as a juvenile court judge began directing that juvenile offenders be sent to that facility. After construction of the new detention center in

---

12. The Petitioner has argued that this interpretation is incorrect as too narrow. It is hard to tell just what Petitioner contends the correct interpretation is (See, e.g., N.T. 42, 43, May 13, 2009, where counsel for Petitioner appears to agree that our interpretation is the only one possible).

13. At the time of the Supreme Court's Remand Order, March 25,2009, these allegations were admitted by Conahan, Ciavarella and Sharkey, who, as of that date, had guilty pleas on record. Conahan and Ciavarella later withdrew their guilty pleas. See, n. 4, *supra*.

Western Pennsylvania was completed in 2005, Ciavarella directed that juvenile offenders be sent to that facility as well.

During the period of approximately 2002 to 2007, Ciavarella was acting as the juvenile court judge of Luzerne County. In that capacity, he frequently ordered accused juvenile offenders detained even when Juvenile Probation Officers did not recommend detention. Ciavarella also exerted pressure on the court staff to recommend detentions of accused juvenile offenders. He also exerted pressure on the court staff to obtain waivers from accused juvenile offenders or their parents of their right to be represented by an attorney. All these actions were designed to increase the number of juveniles sent to the aforementioned new juvenile detention facilities.

During the years 2003 through 2006, Conahan and Ciavarella secretly received more than $2,600,000 in income, in addition to the compensation to which they were lawfully entitled, in exchange for their official actions set out above.

Conahan and Ciavarella took elaborate measures to conceal these payments to them. These measures included numerous wire transfers of funds to the bank accounts of corporations controlled by Conahan and Ciavarella; materially false filings by Conahan and Ciavarella with the Administrative Office of the Pennsylvania Courts failing to disclose their sources of income on the Financial Disclosure Forms required to be filed by the Pennsylvania Supreme Court; and materially false federal income tax returns filed for the years 2003 through 2006.

The "recent revelations of corruption in Luzerne County" also include the allegations in the Information filed against Shar-key on February 3, 2009.[14] These allegations are that Sharkey stole some $70,000 from Luzerne County. These funds were forfeited gambling proceeds and assets seized in Luzerne County by the Pennsylvania Liquor Control Board and the Pennsylvania State Police. It was Sharkey's duty to turn these funds over to the Treasurer of Luzerne County. This he never did; instead he converted the funds to his own use.

C. *Examination of New Evidence of Recent Revelations of Corruption in Luzerne County as After–Discovered Evidence In This Case*

1. Allegations In Informations Against Conahan, Ciavarella and Sharkey.

It is surely true that the conduct described in the Informations against Conahan, Ciavarella and Sharkey is condemnable, deplorable, even shocking, but that is not the question; the question is: is it after-discovered evidence? And more broadly: is there any nexus—any connection at all—between that conduct and the trial of Ann Lokuta? We apply the "four prong test."

We think it is clear that the first two prongs are met: evidence of Conahan's, Ciavarella's and Sharkey's criminal behavior is certainly new—it could not have been obtained before conclusion of the trial by reasonable diligence (first prong); evidence of this behavior is not "corroborative" of any testimony given at the trial nor is it "cumulative" (second prong). However, it is equally clear that the third and fourth prongs are *not* met: evidence of Conahan's, Ciavarella's and Sharkey's criminal behavior could certainly be used to question their credibility; but that is *all*

14. As noted earlier, Sharkey has pleaded guilty to the charges in the Information and his guilty plea still stands.

it could be used for. It is simply not otherwise relevant as it has no connection with Lokuta's behavior which is *the only* subject of this case (third prong); nor is evidence of Conahan's and Ciavarella's and Sharkey's criminal behavior described in the Informations "likely" to require "a different outcome" in this case. We ask: how do allegations that Sharkey stole $70,000 from the county (or even the fact that he did), and how do allegations that Conahan and Ciavarella engaged in an outrageous criminal plot which included the extortion of over $2 million (or even the fact that they did) impact on the trial of Ann Lokuta? We think the answer is obvious. The answer is, it doesn't impact at all It must be remembered that the findings and conclusions that this Court made after the trial were based on the testimony of 30 witnesses who testified about events having no relation whatsoever to the events taking place in the criminal world of Conahan, Ciavarella and Sharkey described in the Informations. It must be remembered that Petitioner's defense at her trial was that the witnesses who testified for the Conduct Board were all liars, perjurers, intimidated by and/or beholden to Conahan. We found these witnesses to be credible; and, in contrast to that finding, we found that the Petitioner's testimony on the subject (covering hundreds of pages in the trial record) to be "often tortured and always attenuated." (*In re Lokuta*, 964 A.2d 988, 1118 (Pa.Ct. Jud.Disc.2008)). As a matter of fact, we found that Petitioner gave false testimony repeatedly during the trial.[15] What Conahan and Ciavarella did concocting and carrying out their criminal scheme, or what Sharkey did helping himself to county money in no way dictate or make likely a different outcome in the case of *In re Lokuta*. In no way does it turn these witnesses into liars—and that is what is necessary in order to make "a different outcome likely."

2. Allegations In Submissions Filed by Petitioner.

Petitioner filed six documents purportedly pursuant to this Court's Order of May 13, 2009.[16] We will examine them one by one.

■ A. *Statement of Patricia Benzi*. In this statement Mrs. Benzi, who was a security guard at the Luzerne County Courthouse, touches on three things:

(a) Over a three-year period, (2003–2005) she delivered envelopes given to her by Billy D'Elia (alleged to be a mob boss) to Judge Conahan in his chambers until Mr. D'Elia went off to jail.

We ask: how is this relevant? How is this admissible in the *Lokuta* case? We don't even know what was in the envelopes. It cannot seriously be argued that this "evidence" would be likely to result in a different outcome, or would cause us to change the sanction we imposed.

■ (b) One morning, Mr. D'Elia gave her an envelope for delivery to *Judge Lokuta*. Mrs. Benzi gave the envelope to Maureen Gushanas (Lokuta's tipstaff and secretary who was a witness for Lokuta at the trial) for delivery to the judge. Later that morning Gushanas returned the envelope to Benzi and angrily told her to tell Billy that "my Judge isn't like the rest of these Judges." Benzi says she then returned the envelope to Mr. D'Elia. (See

---

**15.** *See, e.g., In re Lokuta, supra,* at 1069–70, 1081, 1084–86, 1088, 1123.

**16.** In actuality these filings were made in violation of the Order of May 13, 2009 inasmuch as they have no relation whatsoever with the "recent revelations of corruption in Luzerne County." We will examine them anyway.

para. 13 and 14 of Benzi statement.) The contents of this envelope are likewise unknown—as is the relevance of this testimony in the *Lokuta* case.

It is of interest to note that, on July 1, 2009, Mrs. Benzi testified about these deliveries to Conahan at the hearing conducted by Judge Platt on remand in the case of *Joseph v. The Scranton Times,* —— Pa. ——, 987 A.2d 633 (2009), Platt Hearing N.T. 123–155. At that hearing Mrs. Benzi was asked:

Q. Did you ever deliver envelopes to any judges other than Judge Conahan during the entire time you worked as a security guard?

She answered:

A. No.

Platt Hearing N.T. 144–45. In his Report, Judge Platt found as a fact: "Conahan was the only judge to whom Benzi delivered envelopes." Platt Report, Finding of Fact No. 16.

As "after-discovered evidence" this fails even the first prong. It was not unknown or impossible of discovery before the trial—Lokuta and Gushanas both knew it (if it happened), certainly Gushanas did. Presumably, Lokuta and her lawyers didn't think it was important (or relevant?) and never offered it. Also, of course, it is not known how anyone could contend that this "evidence" has any connection to the *Lokuta* case—much less that it would be likely to change the result (fourth prong).

■ (c) Benzi was "friendly" with an admitted felon named Robert Kulick who was a friend of Billy D'Elia's and Judge Conahan's. She says:

(i) that Kulick told her that he invited Judge Lokuta to a party in order to "make peace" with Judge Conahan;

(ii) that Kulick told her that Lokuta declined the invitation;

(iii) that Kulick told her that Conahan did not want Judge Lokuta to go to the FBI;

(iv) that Kulick told her to find out why Judge Lokuta was meeting with the FBI; and

(v) that Kulick told her that Conahan told him that if she would apologize "everything would go away."

All this is rank hearsay and inadmissible in the *Lokuta* case for that reason; moreover it is irrelevant and has absolutely no connection with the issues in the *Lokuta* case nor bearing on the outcome thereof (fourth prong).

■ B. *Statement of Joseph S. Novak.* Novak is a Luzerne County lawyer who says one day he overheard Conahan tell Ciavarella that they had to get rid of Lokuta and that one (other) day Mr. Chester Brozowski, a sometime tipstaff and courthouse habitué, told Novak that Judge Conahan told him that Conahan wanted Lokuta off the bench.

Insofar as after-discovered evidence is concerned, it should be clearly understood that this isn't even new (first prong). Conahan's dislike for Lokuta was never unknown. It was known at the trial. It was established at the trial. It was never disputed: Conahan testified he couldn't stand her—wished she wouldn't show up for work—she didn't like him either; her tipstaff called him a "fucking pig." (N.T. 1379). So this testimony is obviously "cumulative" (besides not being new) and, for that reason, is not "after discovered evidence" (second prong).

The rest of Novak's statement has to do with some case of his that was in front of Lokuta and then in front of Conahan who gave him a "wink." We are at a loss to grasp the meaning of this and to understand why it is in the submission—unless it is included to imply that Conahan was

giving him and his client favorable treatment. Even if this is the case, it has no connection to the *Lokuta* case and certainly is not likely to cause a different outcome (fourth prong).

■ **C.** *Statement of Carolee Medico Olenginski.* This lady preceded Jill Moran as Prothonotary of Luzerne County and she says that during her term neither she nor, to the best of her knowledge, the court clerks who worked for her had any problems with Judge Lokuta.

This is not after-discovered evidence because it was not unknown and undiscoverable before the trial (first prong). Lokuta knew Olenginski and listed her as a trial witness and set forth in discovery the substance of her expected testimony—which is the same as what is contained in her proffered statement here.

Moreover, it doesn't contradict Moran's testimony because Olenginski has no idea what happened after she left her job and the courthouse. In addition this testimony would not be admissible because it does not address any of the allegations in the Complaint. And, once again, it would not change the outcome (fourth prong).

■ **D.** *Statement of Sandra M. Brulo.* This lady was the Chief Juvenile Probation Officer in Luzerne County from 1996 to 2005. Her statement consists largely of allegations of personal grievances she had with Judge Conahan and complains that:

(i) Conahan ran the courthouse and was sometimes called "the boss";

(ii) Conahan appointed friends, neighbors and nephews to courthouse jobs;

(iii) She "routinely questioned" what she viewed as inappropriate practices and this was not "well received" by the "power structure";

(iv) Conahan unfairly blamed her for limits that were placed on admissions to the new Juvenile Detention Center; and

(v) Ciavarella bet on the races and sometimes collected his winnings in the presence of others; sometimes he wore a "racing hat."

The most that can be said for this statement is that it corroborates Lokuta's defense that everybody lied at her trial because Conahan was "the boss" and he hired and fired everybody, so everybody lied.

First, this statement fails the after-discovered evidence test as it IS "merely corroborative" (second prong).

Second, this evidence will not cause this Court to repudiate its finding that "we assess these witnesses as truthful and their testimony as truthful and we do not believe these witnesses would commit perjury because the president judge wanted them to even—if he did." *In re Lokuta,* 964 A.2d 988, 1118 (Pa.Ct.Jud.Disc.2008) (fourth prong).

Moreover, the idea, testified to at length at the trial, that all the witnesses lied because "these people serve at the leisure of the president judge. All of these people are under the direct control of the president judge." (Testimony of Lokuta, N.T. 2466–68, *see, also,* N.T. 2992–93) was thoroughly debunked by:

(a) The fact that witnesses Murtha–Cowley, Cronin, Sallemi, Krohn, Sammons, Flaherty, Youngclaus, Stankus, Violi, Mecadon and Kostelaba were not employed by the Luzerne County Common Pleas Court and were obviously not under Conahan's "direct control" or serving at "his leisure";

(b) Lokuta's own testimony on the subject which was "often tortured and always attenuated." *See, In re Lokuta,* 964 A.2d 988, 1118–23 (Pa.Ct.Jud.Disc.2008).

**E.** *Letter from Judge Norman A. Krumenacker, III, Common Pleas Judge, Cambria County.* In a letter to Petitioner's counsel dated September 2, 2009, Judge Krumenacker says he overheard a conversation at a cocktail party among three judges, two of whom are not identified; one, however, was "her President Judge, Mark Ciavarella." He doesn't remember when this cocktail party was, but Ciavarella didn't become President Judge until the beginning of 2007 so it must have been after that. He heard Ciavarella say he was "tired of Ann's lack of cooperation" and he also overheard him "indicate" that he was going to "make her life miserable." [17]

It was well established at the trial that President Judge Conahan was tired of her noncooperation, and that prior President Judges Toole and Augello had similar substantial problems with Petitioner, so it's nothing new (first prong) and would be cumulative (second prong) and certainly wouldn't change the Court's decision (fourth prong).

**F.** *Statement filed by Ann Lokuta.* This was filed on October 7, 2009 and reports that a Luzerne County lawyer named John Kennedy told a newspaper reporter and a talk radio show host that at Conahan's request he represented the Luzerne County Court Reporters for nothing, and was a guest in Conahan's Florida condo in 2005 along with his date, Angela Sallemi, one of the court reporters who testified, and Judge Peter Paul Olszewski, Jr.

We suppose this is submitted to prove one or all of the following:

(i) Sallemi lied under oath to reciprocate for Conahan's hospitality, i.e., (she felt she "owed" him, so she lied under oath at a trial three years later);

(ii) Sallemi and *all the court reporters* lied under oath to show their appreciation for Conahan's help in getting a lawyer to represent them for free; [18] and

(iii) Conahan lied under oath when he didn't include Olszewski as a judge with whom he had "a collegial relationship."

All this fails to qualify as after-discovered evidence because it obviously relates solely to credibility (third prong). It is also disqualified as after-discovered evidence because it is not likely that the Court would feel compelled to change the outcome if it were to be admitted (fourth prong). Furthermore, even if it was admitted, it would not provide this Court with any inclination to disaffirm its findings on the credibility of the court reporters. Insofar as Conahan's credibility is

---

17. If this was Ciavarella's intention it is singularly antipathetic to his actions—at least as reported by Petitioner. At the trial she testified about her relationship with Judge Ciavarella as follows: "I did not have problems with President Judge Augello. I don't believe that there are any problems currently with Judge Ciavarella. But then again, Honorable Judges, 1 have been defending this action for this past year. So there have been times that I haven't been there. But each time Judge Ciavarella has given me a new administrative order, because we've changed things, I have complied with it. I've spoken to him. He's called me back. We haven't had any disputes." (Testimony of Lokuta, N.T. 3037).

18. What Kennedy said about this was: "Well, I do a few pro bono cases every year but what that was, that was again five years ago and there was a dispute going on and, it was actually Judge Conahan asked me, asked me to do this. Now, he actually wanted me to bill the county and stuff, but I just didn't feel like doing it. I was dating Angela. I do pro bono work. I didn't mind doing it. It wasn't a lot of work. It was a petition. It was resolved. They got their raise and everybody was satisfied. So, it wasn't like, you know, I did some enormous thing on this thing. I met with public court reporters one day, we did a petition, it was resolved, and, and that was it."

concerned, we ask: what possible reason would Conahan have for failing to name Olszewski as a judge with whom he had "a collegial relationship"? This subject came up at the trial because Petitioner was complaining that none of the judges asked her to have lunch with them. Her lawyer examined Conahan on the subject and he said he didn't go out for lunch. This exceedingly trivial examination ensued:

Q. To me, lunch or not lunch doesn't exhaust the possibility of some social or friendly or collegial relationship. Do you have a collegial relationship with any of the judges on that court?

A. Well, sure.

Q. Would that include all of the judges except Judge Lokuta?

A. No.

Q. Okay. Who would it include?

A. It would probably be Judge Ciavarella. He's my next-door neighbor.

Q. Anyone else?

A. No, not really.

Testimony of Conahan, N.T. 3711–12. Aside from being quintessential trivia, that answer is not necessarily a lie, as is the implication. Maybe Conahan didn't consider his relationship with Olszewski to be "collegial." Does Olszewski's presence in Conahan's condo prove that it was? Maybe Conahan felt he "owed" Olszewski for something or other. Who's to say? One thing that can be said, however, is that it is highly unlikely that Conahan would feel compelled to deliberately lie in order to conceal a relationship with Olszewski. One more thing that can be asked—must be asked—is what if he did? It bears not at all on this Court's findings and conclusions which were based on the conduct of Ann Lokuta described in the trial record in this case.

In short, then, review of the six submissions filed by Petitioner makes plain:

-that all six deal with matters of no consequence,

-that all six have no connection to the "new evidence" "arising from the recent revelations of corruption in Luzerne County" and, thus, all six were filed in violation of this Court's Order of May 13, 2009,

-that all six are not "after-discovered evidence,"

-that all six have no connection to nor bearing on the trial of Ann Lokuta.

As we conclude this portion of this Opinion. we observe that these six submissions serve mainly to establish that the discovery of the criminal depredations of Conahan, Ciavarella and Sharkey provided Petitioner with a straw to reach for. But the plain fact is, there is no straw. Petitioner's decision to submit these items anyway shows the futility of any attempt to establish a connection between those depredations and the trial of this case and. consequently, any attempt to present this Court with any reason to change the sanction order we imposed—or to hold a further hearing in connection therewith—must fail.

### D. *The Joseph and Malinowski Cases*

These two cases: *Joseph, et al. v. The Scranton Times L.P., et al.,* —— Pa. ——, 987 A.2d 633 (2009) (the *Joseph* case) and *Malinowski v. Nanticoke Micro Technologies, Inc., et al.,* Supreme Court of Pennsylvania, No. 51 MM 2009 (the *Malinowski* case), were remanded by the Supreme Court to the Common Pleas Court of Luzerne County [19] upon allegations of corrup-

---

**19.** In the *Joseph* case, the Supreme Court specially appointed Honorable William H.

Platt, President Judge of the Court of Com-

tion engaged in by Conahan and Ciavarella, for determination by the lower court of whether new trials should be held.

In the *Joseph* case the remand was based on "alleg[ations] of corruption III connection with the irregular assignment of former Judge Mark A. Ciavarella to preside over the bench trial in this matter, and the conduct of the actual trial. This Court's exercise of plenary jurisdiction is predicated on the fact that Petitioners have proffered evidence, not previously available, which raises a colorable claim that the irregular assignment and trial of this case were tainted by the involvement of former Judges Michael T. Conahan and Ciavarella." Remand Order, April 7, 2009, *Joseph v. The Scranton Times.*

In accordance with the Remand Order, on July 1 and 2, 2009, Judge Platt conducted a hearing and filed a Report on August 3,2009 recommending that a new trial be granted. Following that recommendation, the Supreme Court ordered a new trial on November 4,2009.

In the *Malinowski* case, the Supreme Court remanded the case to President Judge Chester Muroski of the Court of Common Pleas of Luzerne County and directed him "to examine Petitioner's allegations that judicial corruption infected this matter" and to file a report and recommendation with the Supreme Court. Remand Order, August 5, 2009, *Malinowski v. Nanticoke Micro Technologies, Inc., et al., supra.* Judge Muroski has not yet filed his Report.

In a recent filing with this Court, Petitioner cited these cases pointing out that "the Pennsylvania Supreme Court … ordered new hearings [in these cases]." Presumably, she was suggesting that these orders are precedential here.

Brief address of these cases will demonstrate that they should have no effect on our decision upon remand for these two cases are elementally different from this case.

First, one thing which the *Joseph* and *Malinowski* cases have in common—a commonality not shared with the *Lokuta* case—is that Mark Ciavarella was the lower court judge who decided both cases.

Another thing those two cases have in common, which is missing in this case, is that in both cases the allegation is that the cases were "fixed," i.e., Ciavarella was "in the pocket" of Joseph in the *Joseph* case, and "in the pocket" of the First National Community Bank, one of the defendants in the *Malinowski* case.

Also, in the *Joseph* case there was evidence that Conahan had "steered" the trial assignment to Ciavarella.

In *Malinowski,* Ciavarella sustained the Preliminary Objections of the First National Community Bank to the plaintiffs Complaint. That Order was entered by Ciavarella on December 2, 2005, at a time when Conahan was a Director of that Bank,[20] and it is alleged that Conahan and Ciavarella received favorable treatment from the Bank. (*See, Malinowski, supra,* Application for Exercise of Kings Bench Power, p. 15).

Obviously, Ciavarella was not the trial judge at the *Lokuta* trial and there has been no allegation that this case was "fixed." No one has suggested that the seven judges of this Court were "in the pocket" of the Judicial Conduct Board—or anyone else.

There are other differences between the facts and the context of *Joseph* and *Mali-*

---

mon Pleas of Lehigh County to preside over the remand.

**20.** Conahan was on the Board of Directors of the Bank from 2003 until 2009.

*nowski,* cases tried in the Court of Common Pleas of Luzerne County, and *Lokuta,* tried in the Court of Judicial Discipline, but we believe the dissimilarities already mentioned are so fundamental and so easy to see, that we are constrained not to belabor the point.

Suffice it to say, then, that we have examined, these cases, and we have considered them, and find that they do not cause us to decide this case differently than we do.

Finally, we write briefly to address the Dissenting Opinion of our distinguished colleagues.

1. The dissenting opinion asserts that "Judge Lokuta's efforts to present evidence regarding concerted actions and the culture of corruption [21] which flourished in the Luzerne County Courthouse have been thwarted ... by evidentiary rulings." [22] That simply is not true. Judge Lokuta testified for days, filling hundreds of pages of this record about the "conspiracy" that existed among the "power elite" [23] to "get" her because she was a "maverick judge." [24] In fact, this was her only defense,[25] i.e., that all the witnesses lied because of the "conspiracy." We rejected this defense and held:

> We give no credence to Respondent's perception—conclusion—that the 30 witnesses called by the Board are so terrorized by, or at least so beholden to, the president judge that each one decided to come to court, take the witness stand

and, swear an oath to tell the truth, and then tell lie after lie after lie—all in order to "get" Judge Lokuta.

> First, we assess these witnesses as truthful and their testimony as truthful; and we do not believe these witnesses would commit perjury because the president judge wanted them to—even if he did.

*In re Lokuta,* 964 A.2d 988, 1118 (Pa.Ct. Jud.Disc.2008).

This finding was unanimous; hence it is clear that Judge Lokuta was not thwarted in her efforts to present evidence of "concerted actions."

2. Judge Lokuta was also not thwarted in her efforts by "an inability to explore exculpatory evidence which is under seal and unavailable to her." On the contrary, the so-called "exculpatory evidence" [26] has been turned over to the Supreme Court. This Order was unanimous. See this Court's Order of May 13, 2009 which provided as follows:

> JUDGE SPRAGUE: Please be seated. It is the unanimous ruling of this Court that the proffer of this sealed material does not meet the test of after discovered evidence being cumulative, being to attack credibility and would not in the opinion of this Court have changed the ultimate result.

> Therefore, this Court is ruling there will not be an evidentiary hearing based on this particular group of documents.

---

**21.** We can't tell what evidence of a culture of corruption is being referred to here. We do know that Judge Lokuta was given the opportunity to present evidence "in the nature of after-discovered evidence arising from the recent revelations of corruption in Luzerne County," (Supreme Court Remand Order, March 25, 2009) and she failed to do so.

**22.** Dissenting Opinion, p. ——.

**23.** N.T. 2992.

**24.** N.T. 2467.

**25.** Except for the Eye Doctor.

**26.** This evidence is under seal because of the constitutional injunction that it "shall not be public information." Pa. Const., Art. 5, § 18(a)(8). Moreover, its characterization as "exculpatory" is certainly undeserved.

However, these exhibits will be made part of the record under seal for the Supreme Court of Pennsylvania to have access to make its own determination whether they agree or disagree with the ruling of this Court.

3. The Dissent takes issue with "this Court's declaration that the federal government's indictment of certain of the witnesses against Judge Lokuta and other courthouse insiders[27] for the most base and deplorable forms of public corruption ... does not give occasion to entertain evidence of how that tainted the disposition of the charges against her." This is a declaration, however, in which our dissenting colleagues joined. See this Court's Order of October 27, 2009. We will repeat it:

> In accordance with the Order of the Supreme Court of Pennsylvania of March 25, 2009, upon consideration of the claims of Ann H. Lokuta, Petitioner, in the nature of after-discovered evidence, arising from the recent revelations of corruption in Luzerne County, and after hearing argument and after consideration of the submissions of Petitioner and of the briefs of counsel, it is HEREBY ORDERED that:
>
> 1. the new evidence claim of Ann H. Lokuta, Petitioner, does not require a further hearing on the merits of this Court's Findings of Fact and Conclusions of Law contained in its Opinion of October 30, 2008.

This Court, including the dissenting judges, unanimously ruled that the charges against Judge Lokuta had been established by clear and convincing evidence and that that holding was not affected by any of the "evidence"[28] proffered on remand. That being the case, there is no arguable reason for changing the sanction.

4. Lastly, we remark on the dissent's interpretation of the Supreme Court's description of the evidence we were to consider on remand as "*in the nature of* after-discovered evidence," (emphasis their's) as evidence of the intention of the Supreme Court to include evidence of something *other than* evidence "in the nature of after-discovered evidence." We think it is clear that the words are words of limitation and not the opposite. We think it clear that the test which the Supreme Court has laid down in order for evidence to be "after-discovered evidence," is equally necessary for evidence to be "in the nature of after-discovered evidence."

## III. *CONCLUSION*

Following the instructions of the Supreme Court of Pennsylvania set out in its Remand Order of March 25, 2009, this Court has considered "Petitioner's claims in the nature of after-discovered evidence arising from the recent revelations of corruption in Luzerne County," and, for the reasons set out in this Opinion, have determined that:

1. that "new evidence" does not require a further hearing, and
2. that "new evidence" does not affect the existing determination of this Court to remove Petitioner from judicial office.

President Judge KURTZ and Judges LAMB and BUCCI join.

---

**27.** The federal government indicted Conahan and Ciavarella and filed an Information against Sharkey. No other "courthouse insiders" have been indicted.

**28.** "That" evidence of "the most base and deplorable forms of public corruption" refers to the criminal conduct of Conahan, Ciavarella and Sharkey which we have repeatedly said has no connection to the conduct of Judge Lokuta which fills this record.

Judge STREIB files a Dissenting Statement in which Judges MUSMANNO and O'TOOLE join.

Judge JUDGE did not participate in the consideration or disposition of this case.

## DISSENTING STATEMENT OF Judge STREIB.

I respectfully dissent from the majority opinion and find that Judge Lokuta's "claims in the nature of after-discovered evidence, arising from the recent revelations of corruption in Luzerne County" would in the interest of justice require a new sanction hearing.

The stench of corruption that was present in the Luzerne County Courthouse has permeated and infected these proceedings from the outset. Judge Ann Lokuta did not participate in the wide ranging corrupt practices engaged in by various Luzerne County judges, attorneys, a court administrator, and perhaps even a row officer that have been alleged by federal prosecutors. She nevertheless had to work with and among the parties to these nefarious activities, and function in this polluted culture and environment.

Judge Lokuta has to date been unable to demonstrate these circumstances. Her efforts to present evidence regarding concerted actions and the culture of corruption which flourished in the Luzerne County Courthouse have been thwarted at every turn by evidentiary rulings (which seemed appropriate at the time), by an inability to explore exculpatory evidence which is under seal and unavailable to her, and now by this Court's declaration that the federal government's indictment of certain of the witnesses against Judge Lokuta and other courthouse insiders for the most base and deplorable forms of public corruption and breach of public trust does not give occasion to entertain evidence of how that tainted the disposition of the charges against her, as well as the propriety of the sanctions imposed.

While I certainly agree that some of the charges brought against Judge Lokuta have nothing to do with the alleged criminal conduct simultaneously taking place at the courthouse (such as her misuse of a judicial law clerk to perform personal services for her), and by no means condone that misbehavior on Judge Lokuta's part, the majority ignores the fact that there were many findings made by this Court upon which the unprecedented level of corruption would have bearing, which includes, but is not limited to, Section D of the majority opinion filed October 30, 2008, where testimony is recited regarding Judge Lokuta instructing her staff to have limited contact with other court personnel.

Based upon what we knew then, not what we know now after the federal criminal indictments and allegations of widespread corruption within the courthouse, it was believed that Judge Lokuta was "on a war footing, battle-ready for the warfare which she daily waged with the court departments and other judges, particularly the president judges of Luzerne County." *In re Lokuta*, 964 A.2d 988, 1063 (Pa.Ct. Jud.Disc.2008). We observed then that "[s]he deliberately isolated herself and her staff from the rest of the courthouse and had standing orders that her staff was not to socialize, in or out of the courthouse, with other courthouse employees ... [n]otables included in this category were the prothonotary [who has since entered into a Stipulation of Compromise with federal prosecutors], the court administrator [presently the subject of a federal indictment], and President Judges Toole and Conahan [the latter of whom has been indicted by federal prosecutors and is reputed to be at the heart of most of the corruption within the County].…" *In re Lokuta, supra.*

Our criticism of Judge Lokuta for this "isolation" takes on a whole new meaning when placed within the context of the widespread corruption that now appears to have been taking place. Indeed, it is most ironic that Judge Lokuta would be criticized by this Court for isolating herself and her staff from the very people who have now been indicted for misusing their public office and position to commit crimes that strike at the heart of our judicial system. And, it is also most ironic that these same people are called by the Board to bear witness against Judge Lokuta, but yet she is precluded from presenting evidence regarding their far more serious misdeeds and criminal activities.

More importantly, however, I find Judge Lokuta's proffered evidence most pertinent to the sanctions imposed by this Court as a result of the charges brought against her by the Board. That evidence demonstrates that this was no ordinary judicial environment and no environment to which any judge should be exposed. That, to me, is a serious mitigating factor which does indeed militate in favor of an altered sanction in this case. Accordingly, I dissent from the majority's determination that the evidence proffered by Judge Lokuta does not meet the requirements of after-discovered evidence and would not, in any event, have affected the outcome of this case.

I also believe that the Supreme Court knows full well the requirements for after-discovered evidence and did not gratuitously use the phrase "**in the nature of** after-discovered evidence" (emphasis added) in remanding this case to us. That is, I do not believe that the Supreme Court was asking this Court to simply perform an analysis of the requirements that are needed for evidence to qualify as after-discovered, and that it had a broader scope in mind. As Rule 102 of the Pennsylvania Rules of Evidence instructs us, the purpose of evidentiary rules is "to secure fairness in administration ... to the end that the truth may be ascertained and proceedings justly determined." I do not believe that these goals have been accomplished by this Court's ruling and believe that the sanctions that have been imposed on Judge Lokuta are unduly harsh and unwarranted under the circumstances of this case.

Judges MUSMANNO and O'TOOLE join this Dissenting Statement.