18 A.3d 1098

**In re ADOPTION OF L.J.B.**

**Appeal of C.L.F., Natural Mother.**

Supreme Court of Pennsylvania.

Submitted Oct. 15, 2010.

Decided April 29, 2011.

Amal Munas Bass, Terry L. Fromson, Philadelphia, Women's Law Project, Louis S. Rulli, Penn Legal Assistance Office, for Appellant Amicus Curiae, Community Legal Services, Inc., et al.

Marc Salo Drier, Drier & Dieter Law Offices, Jersey Shore, for S.M.B. and W.K.B.

David Isaac Lindsay, Hall & Lindsay, P.C., for Guardian Ad Litem.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

Justice BAER.[1]

We granted allowance of appeal in this case to examine whether the Clinton County Court of Common Pleas erred in terminating the parental rights of a biological mother to her child, and, in so doing, further erred in determining that no bond existed between mother and child. For the reasons that follow, we vacate the order of the Superior Court, and remand this case to the court of common pleas for an immediate evidentiary hearing to determine if the instant action is now moot, in light of evidence placed on the record while this appeal was pending before the Superior Court, as discussed herein. Moreover, we order that any future proceedings concerning this child, regardless of their nature, be conducted by a jurist from a different judicial district, as appointed via the Administrative Office of Pennsylvania Courts.

### I. Factual and Procedural Histories

#### A. Custody Proceedings

The child in question, L.J.B., was born to C.L.F. (Mother) and S.M.B. (Father) on August 27, 2001. Mother and Father were living together but not married at the time of L.J.B.'s birth, and separated when L.J.B. was eleven months old. Upon their separation, in accord with a written agreement between Mother and Father, L.J.B. lived primarily with Mother and her half-siblings, while Father enjoyed physical custody on, essentially, alternating weekends. Four months after the separation, in November of 2002, Father married W.B. (Stepmother), and soon thereafter filed a custody complaint in the

1. This matter was reassigned to this author.

Clinton County Court of Common Pleas, seeking increased physical custody. After substantial proceedings, on November 19, 2003, the Honorable J. Michael Williamson, President Judge of Clinton County, granted Father's request for increased physical custody of L.J.B., awarding him six consecutive days during each two-week period.

Before proceeding further, it is necessary to detail what was Father's irresponsible conduct involving the child in his quest to undermine Mother's custodial and parental rights. It is also necessary as part of this discussion to specify what we respectfully view as an appearance of impropriety by Judge Williamson, who presided over the custody proceedings.

During the approximate year (November 2002 through November 2003) that the custody proceedings between Father (and, essentially, Stepmother) and Mother were ongoing, the relationship between Father and Mother deteriorated significantly. In fact, on approximately six occasions during the year, Father took L.J.B. to medical professionals claiming that Mother had sexually abused the child, subjecting her to pelvic examinations and pelvic cleaning.[2] Additionally, Father reported Mother to Clinton County Children and Youth Services (CYS) making the same allegations. In due course, the physicians and CYS caseworkers involved determined that Father's allegations were without merit. Eventually, Judge Williamson entered an order, on October 20, 2003, enjoining further unnecessary medical examinations of L.J.B.[3]

---

**2.** We say "approximately six" medical visits for pelvic exams and cleaning because the record does not specify the exact number. Moreover, the record does not specify how many of these exams occurred in hospital emergency rooms and how many in doctors' offices. In this regard, we also note that this is an appeal from the termination of Mother's parental rights, rather than from a custody determination. Thus, the record concerning the extensive custody proceedings, including that of these medical examinations, is before us only because portions of the custody record were entered as an exhibit during the termination action. Of course, we recite only from that which is in the record presently before us.

**3.** We note that on one occasion, Mother took L.J.B. to a physician for a pelvic examination; according to Mother, however, she did this only at Father's insistence. Accordingly, the order was directed to Mother, as well as to Father.

As noted, upon conclusion of the 2002–2003 proceedings, Judge Williamson entered a final order on November 19, 2003, granting Father's petition for increased custody, and awarding him six continuous days out of every two-week period. Mother appealed this order to the Superior Court. During the course of the appeal, Father again accused Mother of sexually abusing L.J.B., this time by way of an ex parte letter sent to Judge Williamson on November 9, 2004.[4] Rather than disregard the ex parte communication, Judge Williamson held a hearing on November 24, 2004 to entertain Father's allegations.[5] As part of the hearing, a memorandum from a CYS caseworker to Judge Williamson concluding that Father's accusations were unfounded was entered into the record. Nevertheless, in an order dated November 30, 2004, Judge Williamson revoked his previous order to cease the continuous pelvic examinations of L.J.B., and permitted Father (and it appears only Father) to subject L.J.B. to such examinations by an agreed upon pediatrician, Dr. Henry Dietrich.

According to Mother, over the course of the next year, Father continued to exhibit aggressive behavior toward her. Mother related that Father repeatedly threatened her over the telephone, followed her home, and arrived at a custody exchange of L.J.B. with a loaded .357 handgun. On January 25, 2006, Father again sought custody modification, this time filing a petition with Judge Williamson for primary physical custody of the child. Two days later, and despite the order of

4. By this point, the Superior Court, by way of an unpublished memorandum opinion filed October 21, 2004, had affirmed the order granting Father increased custody, finding that Judge Williamson did not abuse his discretion. Mother subsequently filed a timely petition for reargument, which was pending when Father sent the November 9 *ex parte* communication. Eventually, on December 17, 2004, the Superior Court denied the reargument petition.

5. As noted, Mother's appeal before the Superior Court from the November 19, 2003 order was still pending at the time of this hearing. While this raises an obvious question concerning Judge Williamson's jurisdiction to hold the November 24, 2004 hearing, neither the transcript of that hearing nor the order stemming from it address this issue. We do note that Judge Williamson actually admonished Mother's counsel during the hearing to "stop fooling around with the Appellate Courts...." Notes of Testimony (N.T.), Docket No. 802–02, Nov. 24, 2004 at 17.

November 30, 2004, that any further medical examinations were only to be conducted by Dr. Dietrich, Father took L.J.B. to an emergency room at 11:00 p.m. for what would be the child's eighth vaginal examination since November 2002. The record reveals that an intrusive examination, complete with color photographs, was undertaken. As with the prior exams, this one revealed no evidence of sexual or physical abuse.

After the January 2006 examination, CYS sent a second memorandum to Judge Williamson, in which it threatened to "open an abuse investigation if [Father and Stepmother] continue to have the child unnecessarily examined or cleaned." Moreover, the Agency stated that it would "also request a temporary change in visitation [*e.g.*, the custody/partial custody arrangement] during the course of the investigation." Notes of Testimony (N.T.), Docket No. 802–02, Feb. 10, 2006 at 43.

Notwithstanding CYS's obvious concerns over Father's conduct and L.J.B.'s well-being, on February 10 and March 2, 2006, Judge Williamson held a hearing concerning Father's petition for primary physical custody. The court reserved ruling on the matter, instead referring Mother and Father to a court-appointed psychologist "for the purpose of enabling [the psychologist] to submit to the Court his observations and thoughts with regard to the psychological background of these parents." *C.L.F. v. S.M.B.*, No. 802–02, Order of Court (Mar. 6, 2006) (Williamson, P.J.).

While completion of the psychological evaluations and resumption of the custody hearing were pending, in late March 2006, Mother abruptly dropped L.J.B. off with Father and Stepmother, dropped her other children off with their fathers, and moved to Tennessee. In the subsequent termination proceedings, Mother explained that she felt she had no choice but to give up her custody battle and leave the area to protect L.J.B. from continued pelvic examinations. She elaborated that Father had continued to threaten her, in her view CYS had failed to take any action against Father or to protect L.J.B., and she believed Judge Williamson to be biased against her. Thus, according to Mother, in an effort to protect L.J.B.,

she surrendered physical custody of her to Father, and moved to Tennessee. Upon Mother's relocation, Judge Williamson evidently viewed the litigation over primary physical and legal custody as moot, and entered an order granting Father sole physical and legal custody of L.J.B. In the court's order, it explained that in its view Mother had "abruptly and without prior notice to anyone, dropped her children off with their various fathers, and moved to Tennessee." *Id.,* Order of Court (Apr. 3, 2006) (Williamson, P.J.).

Over the course of the next year, Mother attempted to maintain contact with L.J.B. from Tennessee through arranged weekly telephone conversations. She also accepted a proposed visitation arrangement (brokered by the court-appointed psychologist) of one weekend a month with the child. According to Mother, however, Father and Stepmother repeatedly cut short the telephone conversations, and circumvented Mother's attempts to visit. Indeed, it was not until December of 2006, after the psychologist and the court intervened, that Mother finally visited with L.J.B. This visit consisted of a two-hour meeting at a McDonald's in Clinton County, where Father and Stepmother remained present throughout the reunion of Mother and L.J.B.

Throughout 2007, Mother continued her attempts to remain in contact with L.J.B. Her efforts included the making of telephone calls, the sending of presents, and the arranging for "proxy calls" by L.J.B.'s half-siblings. According to Mother, however, these efforts were thwarted by Father and Stepmother. This led L.J.B.'s maternal Grandmother to petition for visitation in the summer of 2007. During the hearing on this petition, Judge Williamson continuously berated Grandmother for both her and Mother's actions over the course of L.J.B.'s life. As detailed *infra,* Part III, Judge Williamson voiced his disgust over what he viewed as Mother's abandonment of L.J.B., and went so far as to suggest that Father seek to terminate Mother's parental rights. *See* N.T., Docket No. 818–07, Jul. 11, 2007 at 9, 11. Despite his expressed viewpoint regarding Mother and, apparently by derivation, Grandmother, Judge Williamson granted Grandmother one supervised

visit with L.J.B. *See B.J.B. v. S.M.B.*, No. 818–07, Order of Court (Jul. 11, 2007) (Williamson, P.J.) (directing CYS to "arrange a supervised visit between Grandmother and the child; following which, we will consider the entry of a further Order.").

A meeting between Grandmother and L.J.B. did, in fact, occur and, afterwards, CYS memorialized to Judge Williamson that Father was not going to allow any further meetings. *See* Memorandum from CYS to Judge Williamson (Jul. 23, 2007) ("[CYS caseworker] attempted to schedule additional visits but [Father] refused. He said that he is unable to do so due to his work schedule. [Caseworker] pointed out that [Stepmother] can bring [L.J.B.] into the office, but [Father] said that he would speak to his lawyer. He left the visit angry. It is clear that some, if not all of [L.J.B.'s] reluctance to visit [with Grandmother] is because of [Father's] attitude."). Judge Williamson then placed another order on the record, directing that Father was to permit Grandmother visitation once a month.

Immediately thereafter, Father's counsel submitted a letter to Judge Williamson, noting that Judge Williamson's initial order pertaining to Grandmother's visitation only directed Father to take L.J.B. to meet with Grandmother once. *See* Letter from Marc S. Drier, Esq., to Judge Williamson (Jul. 26, 2007). Counsel contended that Grandmother "disturbed" the child by stating that Mother and her half-siblings missed her. *Id.* Without a hearing, Judge Williamson terminated Grandmother's visits. *See B.J.B. v. S.M.B.*, No. 818–07, Order of Court (Sep. 4, 2007) (Williamson, P.J.). Following this order, Mother continued to attempt to contact L.J.B. by telephone and the sending of gifts; but Father and Stepmother refused or cut short the calls and apparently did not give L.J.B. the gifts.

## B. Termination Trial

On December 18, 2008, Father and Stepmother petitioned to terminate Mother's parental rights involuntarily, to make way for Stepmother's adoption of L.J.B., pursuant to 23 Pa.C.S.

§§ 2511 and 2512.[6] Father and Stepmother alleged that Mother had abandoned L.J.B. for a period of at least six months, as provided in Section 2511(a), by not contacting or visiting L.J.B. from mid–2007 to the filing date of the petition for termination, and that the "other considerations," as set forth at Section 2511(b) (*i.e.*, the best interests of L.J.B.), also favored termination.

Following the appointment of a guardian *ad litem* for L.J.B., a termination trial commenced before the Honorable Craig P. Miller on April 30, 2009.[7] Mother testified that

**6.** Sections 2511 and 2512 of the Pennsylvania Adoption Code provide, in relevant part:

> **Section 2511. Grounds for involuntary termination**
> (a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
> \* \* \*
> (b) **Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.
> **Section 2512. Petition for involuntary termination**
> (a) **Who may file.**—A petition to terminate parental rights with respect to a child under the age of 18 years may be filed by any of the following:
> (1) Either parent when termination is sought with respect to the other parent.
> (2) An agency.
> \* \* \*
> (b) **Contents.**—The petition shall set forth specifically those grounds and facts alleged as the basis for terminating parental rights. The petition filed under this section shall also contain an averment that the petitioner will assume custody of the child until such time as the child is adopted. If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists.

**7.** Clinton County has only two jurists, Judges Williamson and Miller. Judge Williamson heard all the custody proceedings in this case, and

Father continuously subjected L.J.B. to pelvic examinations and cleanings, and that Judge Williamson refused to put a stop to these procedures. Mother explained that she gave up the custody fight and moved to Tennessee because she believed that this was the only way to save L.J.B. from the continuing medical examinations. Mother stated that she intended to commence new custody proceedings in Clinton County once Judge Williamson retired because she believed that he was biased against her. In support of her contentions, Mother placed into evidence portions of the record of the custody proceedings.

During their testimony, Father and Stepmother repeatedly denied any wrongdoing or obstruction, and adamantly averred that Mother had abandoned L.J.B. without any justification whatsoever. Father further reiterated his belief that Mother may have abused L.J.B. After the close of the testimony, Judge Miller conducted an in chambers interview with L.J.B., in the presence of counsel, in an attempt to determine what bond, if any, existed between L.J.B. and Mother.

At the conclusion of the trial, Judge Miller issued an opinion and accompanying order, in which he found that Mother had abandoned L.J.B. for at least six months (as provided by Section 2511(a)) when Mother relocated to Tennessee and failed to keep in contact with L.J.B. Much of his reasoning concerned what Judge Miller termed as Mother's mistaken belief that Judge Williamson was biased against her. Judge Miller thus decreed that Mother's parental rights to L.J.B. be permanently terminated, and that Father remain in sole physical and legal custody of L.J.B.

### C. Mother's Appeal of the Termination of Her Parental Rights

Mother appealed to the Superior Court, contending that Judge Miller erred in finding that Father proved, by clear and convincing evidence, that the totality of the circumstances supported the termination of parental rights. *See In re B.,*

Judge Miller presided over all of the involuntary termination proceedings.

*N.M.*, 856 A.2d 847, 855 (Pa.Super.2004) (providing that the entire history of a case must be examined when considering the termination of parental rights, which may only be granted "if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination."). Mother argued that Father and Stepmother actively obstructed her reasonable efforts to maintain the parental relationship with L.J.B., and that under the facts of this case, termination of Mother's parental rights was improper. *See In re M.A.K.*, 489 Pa. 597, 414 A.2d 1052 (1980) (where a parent exercises "reasonable firmness" in refusing to yield to obstacles, which prevent maintenance of the parental relationship, termination under Section 2511(a) is not proper).

While Mother's appeal was pending before the Superior Court, Judge Miller twice supplemented the record by way of orders of November 25, 2009 and January 29, 2010. The supplementations to the certified record reflected two pieces of correspondence he received after he entered the final termination decree: one from L.J.B.'s guardian *ad litem*, Attorney David I. Lindsay, and the other from Stepmother.

By way of background, as reflected in the appendix to Mother's brief to this Court, Mother informed Attorney Lindsay on November 12, 2009, that Stepmother and Father were divorcing, and that Stepmother no longer wished to adopt L.J.B. While Attorney Lindsay initially responded to Mother that he found her claims without factual or legal basis, he subsequently wrote to Judge Miller on November 16, 2009, relating that, after speaking with Father and Stepmother, he learned (1) Stepmother and Father had indeed separated and intended to divorce; (2) contact between Stepmother and L.J.B. had significantly decreased; and (3) Stepmother had reservations concerning her adoption of L.J.B. *See* Letter from David I. Lindsay, Esq. to Judge Craig P. Miller (Nov. 16, 2009) (found at Mother's Brief, Appendix E).

On January 22, 2010, Stepmother wrote a lengthy letter to Judge Miller (Judge Williamson, Father and Stepmother's jointly retained attorney, and Attorney Lindsay all received copies) detailing the animosity that had developed between

Father and her since their separation, notably including averments that Father was "aggressive" toward her. Moreover, Stepmother noted that Father was no longer permitting her to visit with L.J.B. Accordingly, while Stepmother reiterated her desire to be a part of L.J.B.'s life and how she regarded L.J.B. as her own daughter, given the developments between her and Father, and further because of financial constraints, Stepmother averred, "at this time I feel it would be best to drop the adoption." Letter from Stepmother to Judge Miller, *et al.* (Jan. 22, 2010) (found at Mother's Brief, Appendix F.).

As noted above, Judge Miller ordered that the November 16 letter from Attorney Lindsay, and the January 22 letter from Stepmother, be forwarded to the Superior Court as supplements to the certified record. *See In re Adoption of L.J.B.*, No. 21–2008, Order Supplementing Certified Record (Nov. 29, 2009) (Miller, J.); *Id.*, Order Supplementing Certified Record (filed Jan. 22, 2010) (Miller, J.). However, neither the certified record currently before us, nor the appendices to any of the parties' briefs, reflect that Stepmother has formally filed any petition, application, or praecipe to withdraw her petition to adopt L.J.B.

The Superior Court, in an unpublished opinion, unanimously affirmed the termination of Mother's parental rights, holding that the obstacles placed in Mother's path by Father, Judge Williamson, and CYS were not sufficient to overcome the evidence presented by Father that she abandoned L.J.B. for the statutory period of six months. It does not appear that the Superior Court considered the supplements to the certified record, and what effect they might have on the ultimate outcome of the appeal. Mother petitioned this court for allowance of appeal, which we granted to examine the propriety of the termination order.

## II. Termination of Mother's Parental Rights

In cases concerning the involuntary termination of parental rights, our review is limited to a determination of whether the decree of the termination court is supported by competent evidence. *Adoption of B.D.S.*, 494 Pa. 171, 431

A.2d 203, 207 (1981). The party petitioning for termination "must prove the statutory criteria for that termination by at least clear and convincing evidence." *In re T.R.*, 502 Pa. 165, 465 A.2d 642, 644 (1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 521 Pa. 300, 555 A.2d 1202, 1203–04 (1989). Concerning the termination of parental rights due to abandonment pursuant to Section 2511(a),

> Where the evidence clearly establishes that the parent has failed to perform parental duties or has evidenced a settled purpose of relinquishing parental claim to the child for a period in excess of six months, the individual circumstances and any explanations offered by the parent must be examined to determine if that evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination of parental rights.

*Adoption of Atencio*, 539 Pa. 161, 650 A.2d 1064, 1066 (1994). Finally, should sufficient evidence not exist to support the termination decree, the trial court will be deemed to have committed an abuse of discretion, thus mandating reversal of the decree. *See id.* at 1068.

In Pennsylvania, a petition to terminate a natural parent's rights involuntarily when filed by one parent against the other is only cognizable when it is accompanied by a prospective stepparent's intention to adopt the child. *See* 23 Pa.C.S. § 2512(b) (providing that, only if a children and youth agency is moving for termination may such termination proceed without a concomitant intent to adopt the child by a prospective stepparent).[8] Under the predecessor to Section 2512, 1 P.S.

---

**8.** This section of the Adoption Act deals only with petitions for involuntary termination, and, as detailed in the text, provides only that a petitioning agency shall not be required in the termination petition to aver that adoption is presently contemplated or that a person intending to adopt exists. This begs the question of whether the agency must intend subsequent to termination to seek out an adoptive parent. That issue is not before us, and we specifically leave it for another day.

§ 312, *repealed and replaced by* 23 Pa.C.S. § 2512, effective Jan. 1, 1981,[9] this Court held that Pennsylvania adoption law "indicates that a parent may bring a petition for termination of the parental rights of the other parent only when adoption is contemplated." *In re B.E.*, 474 Pa. 139, 377 A.2d 153, 155 (1977); *see also In re Burns*, 474 Pa. 615, 379 A.2d 535, 541 (1977) (when initiated by a natural parent, termination of the other parent's rights may only occur with a present contemplation of adoption, as the sole purpose of termination is to remove any hindrance to the potential adoption of a child).

In *B.E.*, a child's natural mother had sole custody of her child since birth, and had not remarried since her divorce from the child's natural father. *Id.* at 154. In her petition to terminate father's parental rights, she conceded that she had no plans to remarry or have the child adopted by a stepfather. *Id.* This Court held that termination of the father's rights could not occur, as Section 312/2512 of the Adoption Act "provides for termination of parental rights only in connection with a plan for adoption." *Id.*[10] Indeed, the Court noted that the legislative purpose behind permitting involuntary termination of parental rights:

> is not to punish an ineffective or negligent parent, or provide a means for changing the surname of the child. Rather, the purpose of involuntary termination of parental rights is to dispense with the need for parental consent to

**9.** For purposes of this appeal, the re-codification of the Adoption Act, 1 P.S. § 101, *et seq.*, into the Domestic Relations Code, Title 23 of the Consolidated Statutes, 23 Pa.C.S. § 2101, *et seq.*, is of no moment, as no substantive amendments were made to the provisions relevant to this case.

**10.** As noted throughout the opinions of the courts below, termination of Mother's parental rights occurred pursuant to Section 2511. While Section 2511 delineates the grounds for involuntary termination of parental rights, Section 2512 governs the requisites for a valid petition for termination, and accordingly is equally relevant and controlling regarding this appeal. Also telling is that involuntary termination falls under a chapter in the re-codified Adoption Act entitled "Proceedings Prior to Petition to Adopt."

an adoption when, by choice or neglect, a parent has failed to meet the continuing needs of the child.

*Id.* at 156.

Once a natural parent's rights are terminated, the concomitant adoption fosters a "new parent-child relationship." *Id.* Such a rule is sound because "[t]ermination of the natural parent's rights prior to adoption and allowance of stepparent adoption is for purposes of protecting the integrity and stability of the new family unit." *Adoption of J.D.S.*, 763 A.2d 867, 871 (Pa.Super.2000). Indeed, where a prospective stepparent, due to separation or pending divorce with the other natural parent, will no longer complete the family unit, the termination of a natural parent's rights due to abandonment must be vacated. *Id.* at 872. Thus, where "no new parent-child relationship is contemplated," the "involuntary termination of ... parent rights ... is not permitted under the Adoption Act." *B.E.*, 377 A.2d at 156; *see also T.R.*, 465 A.2d at 644 n. 10 (determining that courts of common pleas "should consider, and not merely accept on its face, [the potential stepparent's and his or her spouse's] Declaration of Intent to Adopt, so that the issue of whether they genuinely seek termination solely as an aid to adoption to thereby establish a new parent-child relationship, the singular concern of the Adoption Act, may properly be determined.").[11]

As noted above, the supplements to the certified record by Judge Miller reflect an intention by Stepmother to no longer seek adoption of L.J.B., and that Stepmother and Father seem to be irreconcilably separated. While neither the docket nor the certified record reflects a formal praecipe or petition on Stepmother's behalf withdrawing her petition for adoption, the factual circumstances of this case certainly reflect the drastic change in circumstances. To that extent, Attorney Lindsay explained in his November 2009 letter to Judge Miller that Stepmother "appears to have some concerns" in regard to the adoption, and that the bond between Stepmother and L.J.B. "appears, regrettably, to lessen in both frequency and dura-

11. The public policy behind this is simple: Pennsylvania will not countenance state-created orphans.

tion as time passes," due to the separation and growing animosity between Father and Stepmother. Letter from David I. Lindsay, Esq. to Judge Craig P. Miller (Nov. 16, 2009) (found at Mother's Brief, Appendix E). Stepmother has related similar proclamations:

> This is the most difficult decision I have ever had to make and finalizing it is very hard for me. However, at this time I feel it would be best to drop the adoption. I did tell [her attorney, Attorney Lindsay, and Father] this in October 2009. However, I am still receiving all letters, and court documents.

Letter from Stepmother to Judge Miller, *et al.* (Jan. 22, 2010) (found at Mother's Brief, Appendix F.). Stepmother further detailed in the letter the alleged aggressive behavior by Father toward her in the months after their separation. *Id.*

Notwithstanding the absence of a formal praecipe or discontinuance, the facts as exhibited in the letters of November 16, 2009 and January 22, 2010, reflect that Stepmother no longer wishes to adopt L.J.B., and that the "family unit" of Stepmother and Father appears to be permanently fractured. Under Section 2512 and general Pennsylvania jurisprudence as referenced above, the petition for termination of Mother's rights is potentially moot, as it cannot be effected without Stepmother's attendant adoption of L.J.B. *See* 23 Pa.C.S. § 2512; *B.E.*, 377 A.2d at 155–56; *T.R.*, 465 A.2d at 644 n. 10; *J.D.S.*, 763 A.2d at 871.

 This Court should not decide moot cases. *See Pap's A.M. v. City of Erie,* 571 Pa. 375, 812 A.2d 591, 599 (2002) ("This Court generally will not decide moot questions."); *see also In re Cain,* 527 Pa. 260, 590 A.2d 291, 292 (1991) ("The cases presenting mootness problems involve litigants who clearly had standing to sue at the outset of the litigation. The problems arise from events occurring after the lawsuit has gotten under way-changes in the facts or in the law-which allegedly deprive the litigant of the necessary stake in the outcome. The mootness doctrine requires that an actual case or controversy must be extant at all stages of review, not

merely at the time the complaint is filed.") (quoting *In re Gross*, 476 Pa. 203, 382 A.2d 116, 119 (1978)). Without a formal docket entry or findings of fact, however, the final decision regarding mootness cannot be made by this Court upon this record. Nevertheless, as the jurisprudence in this area of the law is clear, it would not be prudent for this Court to render a decision on the merits of Mother's appeal, with the outstanding question of mootness remaining in this case.

In dissent, Madame Justice Orie Melvin faults us for ordering a remand to the court of common pleas, rather than examining the "propriety of the decree terminating Mother's parental rights, which is the only matter before us." Dissenting Op. at 258–59, 18 A.3d at 1125 (Orie Melvin, J., dissenting). Respectfully, we note multiple instances where, in our view, the Dissent's observations miss the mark.

First, contrary to the suggestion of the Dissent, the issue of mootness is squarely before us, and is a distinct portion of Mother's challenge to the termination decree. Mother raised a suggestion of mootness at her first possible opportunity: in her reply brief to the Superior Court after Judge Miller supplemented the record. Mother also explicitly raises the potential mootness of the termination proceedings before this Court. See Mother's Brief at 65–67. In support of her contention that this case should be deemed moot, Mother quotes the underlying policy, as elucidated by the Superior Court in *J.D.S.*, 763 A.2d at 872: "[N]o gain to the child or society is achieved by permitting the termination of the natural [mother's] rights in order to permit adoption by a [stepmother] who no longer resides with the child's [father]. The policy consideration for permitting stepparent adoption *is defeated by separation and contemplation of divorce.*" Mother's Brief at 66 (emphasis added). Thus, contrary to the Dissent's assertions, we do not raise mootness as a matter of "supererogatory." [12]

12. The Dissent also takes this opinion to task for considering the letters from Attorney Lindsay and Stepmother. However, they are part of this record, and we are thus duty bound to examine them, and to comment upon them to the extent they are germane to a properly framed issue.

Moreover, the Dissent objects to a determination of whether this case is moot when its merits can be decided adverse to the party seeking termination, which would conclude this litigation on its merits. There is admittedly something satisfying about "just deciding it." However, courts have long restrained themselves from deciding moot cases, including those, as recognized on pages 259–61, 18 A.3d at 1126–27 of the Dissent, which become moot during their pendency. *See Gross,* 382 A.2d at 119 (Pa.1978), *quoted in* Dissenting Op. at 259–61, 18 A.3d at 1126–27 (Orie Melvin, J., dissenting); *see also Pap's A.M.,* 812 A.2d at 599. We do no more here than follow this long enshrined and wise prudential rule.

The Dissent also opines that even if this case is moot because of the lack of a stepparent to take the natural parent's place, it can and should be decided. Respectfully, we believe the Dissent has conflated the statutory provision involving agency adoptions, *see* 23 Pa.C.S. § 2512(b), with private stepparent adoptions. The applicable statutory language provides that a petitioning agency shall not be required to aver that adoption is presently contemplated nor that a person with present intention to adopt exists. *See Burns,* 379 A.2d at 541 (holding that, when "a child is in the custody of an approved adoption agency," no need exists for either the child to be imminently adopted or for the agency to put an adoption plan into motion, as "one of the purposes of the Adoption Act of 1970 was to permit an agency to seek termination of parental rights independently of adoption.").

Not only is this specifically inapplicable to a private adoption, but by corollary it suggests that when a mother or father seeks to terminate the other parent's rights, the averment that adoption is presently contemplated and that a person has a present intention to adopt is specifically required. Indeed, *B.E.,* 377 A.2d at 155, is strong and unaltered precedent in support of this interpretation. As said above, the idea that the state should create orphans is inimical to our family-centered society. Moreover, the creation of parental termination absent stepparent adoption would provide parents with a new, and in our view dangerous, tactic in heated custody

disputes; indeed, one can imagine routine cross-petitions for termination as part of custody battles under the Dissent's suggestion that termination may occur without a ready step-parent.[13]

▮▮▮ For all of these reasons, we vacate the decree of Judge Miller terminating Mother's parental rights, and remand for an evidentiary hearing regarding the intention of Stepmother to adopt L.J.B. If, as every inference suggests, Stepmother has no intention of adopting L.J.B., in accord with all of the law set forth herein, the petition to terminate Mother's parental rights should be dismissed by the court of common pleas.

### III. Recusal of Judges Williamson and Miller

▮▮▮ Upon remand, we further *sua sponte* order the recusal of Judges Williamson and Miller from any further proceedings involving L.J.B. regardless of who the particular parties are (*e.g.*, Mother, Father, Stepmother, Grandmother, uncles, aunts, half-siblings, etc.). As reflected in Part I, *infra*, these legal proceedings began several years ago as an extremely contentious custody battle in front of Judge Williamson. In our view, Judge Williamson's apparent antagonism towards Mother is evident from the record. Indeed, our exhaustive review of the proceedings reveals, at a minimum, the following incidents attributable to Judge Williamson:

(1) Permitted and entertained *ex parte* communications from Father regarding L.J.B. and Mother; *see* N.T., Docket No. 802–02 (*C.L.F. v. S.M.B.*, Father's Petition for Modification of Custody), Nov. 24, 2004 at 3;

---

13. While indicating no disagreement with the law's clear mandate that terminations may not occur without ready stepparents, the three Dissenting Justices assert that disposing of this case on the bases forwarded herein is not proper in light of this appeal being fashioned as a "children's fast track" matter. We applaud the Dissenting Opinions' concern that this matter be concluded expeditiously for the sake of this Child, and agree. Nevertheless, we see no reason why this remand on jurisprudentially sound grounds will cause a meaningful delay. At the outset of this opinion, we called for an immediate hearing, and it is our expectation that, notwithstanding this remand, this matter will be concluded very shortly.

(2) Ignored repeated warnings from CYS regarding the falsity of Father and Stepmother's allegations of sexual abuse by Mother; *see generally C.L.F. v. S.M.B.*, Proceedings of Nov. 24, 2004 and February/March 2006;

(3) Without provocation criticized Mother's conduct over the "past ten years," when at that point L.J.B. was only five years old; N.T., Docket No. 818–07 (*B.J.B. v. S.M.B.*, Petition for Visitation by Grandmother, B.J.B.), Jul. 11, 2007 at 9;

(4) Stated that Mother "dumped" L.J.B. on Father; *id.* at 10; while [running] off and abandon[ing L.J.B.];" *id.* at 11;

(5) Stated that information placed on an advocacy website by Mother (and/or Grandmother) was "garbage . . . and if you continue to publish this kind of stuff, you'll never see this child again."; *id.* at 10–11;

(6) Advised Father to have Mother jailed "the next time you find her in Clinton County," due to Mother's alleged failure to pay child support; *id.* at 8; [14]

(7) Advocated to Father that he seek termination of Mother's parental rights; *id.* at 11; [15] and

(8) Failed to enforce orders barring further pelvic examinations of L.J.B. against Father/Stepmother. *see e.g.* N.T., Docket No. 21–2008 (*In re Adoption of L.J.B.*, Termination Trial), Apr. 30, 2009 at 143, 149.[16]

14. It should be noted that, several months after the July 11, 2007 hearing, Father acted on Judge Williamson's advice and had Mother arrested and incarcerated overnight on the very next occasion he observed her in Clinton County. While it is not an appropriate subject for this opinion, it is not at all clear from the record that the arrest was justified.

15. As evinced by this appeal, Father acted upon this advice, as well.

16. On this point, we must note that the plague is certainly not solely on Judge Williamson's house. As revealed above, Father subjected L.J.B. to no less than eight pelvic examinations before the child's eighth birthday. Notwithstanding the lack of any evidence to the contrary, Father continuously accused Mother of sexual abuse of L.J.B., and in a vain attempt to gather evidence in support of this contention, forced L.J.B. to undergo and endure the trauma of these examinations. This reprehensible conduct, however, is at least partially derivative of Judge

Generally, a party must seek to have a judge recused from a case, by first bringing the petition for recusal before that jurist, thus enabling the judge to evaluate the reasons for recusal firsthand. *See Commonwealth v. Whitmore,* 590 Pa. 376, 912 A.2d 827, 833 (2006). "This is, in part, to allow the requested judge to state his or her reasons for granting or denying the motion and, as the allegedly biased party, to develop a record on the matter." *Id.* The final determination by that judge may then be reviewed by an appellate court, but may only be reversed upon an abuse of discretion. *Id.* Nevertheless, in our explicit constitutional authority to supervise the courts of the Commonwealth, it is not outside this Court's power to *sua sponte* order the removal of a jurist from a case. *Id.* at 832 (holding that the Superior Court may not order the *sua sponte* removal of a judge from a case; "such a question falls within the supervisory and administrative powers over all of the courts" granted to this Court by the Pennsylvania Constitution, Article V, Section 10(c).).

In that capacity, we will order the resolution of a legal dispute before a new judge on the mere "appearance of impropriety," which may be shown where "there are factors or circumstances that may reasonably question the jurist's impartiality in the matter." *Joseph v. Scranton Times,* 604 Pa. 677, 987 A.2d 633, 634 (2009) *(per curiam ).* In our opinion, the facts as related herein reflect, at best, an "appearance of impropriety," by Judge Williamson against Mother.[17] Upon

Williamson's refusal to enforce his own orders banning the examinations.

In this same vein, we must further lay fault upon Clinton County CYS. As reflected in the record, CYS had constant contact with all parties involved in this case. Despite this extensive involvement, the agency failed to take necessary action to stop the repeated and unnecessary pelvic examinations of this child. As poignantly queried recently by one scholar, "which is worse: the harm that results from maltreatment at the hands of a parent or the harm that results from the maltreatment of a state agency?" Kurt Mundorff, *Children as Chattel: Invoking the Thirteenth Amendment to Reform Child Welfare,* 1 CARDOZO PUB.L. POL'Y & ETHICS J. 131, 148 (May 2003).

**17.** At worst, the facts suggest the development of an outright bias by Judge Williamson against Mother. We, however, have deep respect for all of Pennsylvania's jurists, and specifically decline to reach that

remand, this case is going to continue either as a termination or custody proceeding. The custody proceedings involving L.J.B. have been handled by Judge Williamson in the past, and there is no indication that, absent intervention from this Court, his involvement would cease. Accordingly, in our respectful view, protection of this otherwise helpless child caught in the maelstrom precipitated by these many adults requires reassignment of all proceedings involving L.J.B. to a judge other than Judge Williamson.

Normally, such appointment of a new judge to preside upon remand could fall to another judge within the same judicial district. However, as noted, Judge Williamson and Judge Miller are the only two commissioned judges of Clinton County. Further, the record and transcript of the custody proceedings before Judge Williamson were admitted into evidence during the termination trial before Judge Miller, who, in examining the totality of the circumstances of Mother's "abandonment," apparently did not consider the potential appearance of impropriety by Judge Williamson against Mother. Indeed, without addressing her allegations of bias, Judge Miller faulted Mother for wanting to wait until Judge Williamson's retirement before again availing herself of the Pennsylvania court system. *See In re Adoption of L.J.B.*, No. 21–2008, Termination Tr. Slip Op at 12 (May 27, 2009); *see also* Super. Ct. Mem. Op. at 12.

Given what has to be a collaborative relationship and considering both of their involvements in this case, we believe justice, and, as importantly, the interests of L.J.B., who has suffered enough for a lifetime, would best be served by a fresh pair of eyes and a fresh perspective. Thus, we order that all additional proceedings [18] involving these parties be entertained

conclusion on this record. We also must note that we are well aware of the deep, emotional strain caused to all participants, including the trial judge, by a contentious custody battle, which too often reaches the level of an all-out war between the parties. When a trial judge finds himself or herself becoming emotionally involved or frustrated by such a case, it may well be the better practice to step aside in favor of a new judicial figure. In the end, that is all we order here.

**18.** With all due respect to the Dissent, even if this Court were to decide the merits of the termination decree, to think that custody proceedings

by a new jurist from a different judicial district, as coordinated by the Administrative Office of Pennsylvania Courts.[19]

## IV. Conclusion

In summary, we vacate the order of the Superior Court, and remand this case for an immediate hearing and final determination regarding Stepmother's intention to adopt L.J.B., and if it is determined that she will not be so proceeding, the court of common pleas shall dismiss this matter as moot pursuant to 23 Pa.C.S. § 2512. Further, we direct that all further proceedings involving L.J.B., upon remand and beyond, be held before a new jurist, not from Clinton County, as appointed by the Administrative Office of Pennsylvania Courts. Pending receipt of the decision by the court of common pleas upon remand, this Court otherwise retains jurisdiction.

Justice McCAFFERY joins the Opinion Announcing the Judgment of the Court.

Justice SAYLOR files a concurring opinion in which Chief Justice CASTILLE joins.

Justice TODD files a concurring and dissenting opinion.

would not inevitably develop following our decision, or that neither Judge Williamson nor Judge Miller would handle those proceedings moving forward, is to deny the reality of the situation. Moreover, the suggestion that either Judge Williamson or Judge Miller would voluntarily recuse himself from further proceedings is also belied by this record.

19. Mr. Justice Saylor has filed a Concurring Opinion (joined by Chief Justice Castille), which fully joins in the disposition of Parts II and III supporting a remand to determine the status of the case and for the proceedings on remand to occur before a new jurist.

We note that in the Concurrence's final sentence, it reflects uncertainty regarding any "actual bias" by the Clinton County bench towards Mother, but acknowledges the appearance issue that the custody judge's comments created. We are in complete accord with that observation. Like the Concurring Opinion, we are uncertain that there was any actual bias, and called for the "fresh pair of eyes" because of the "ill-informed and intemperate" nature of the "extraneous remarks." *See* Concurring Op. at 240, 18 A.3d at 1114 (Saylor, J., concurring).

Justice EAKIN files a dissenting opinion.

Justice ORIE MELVIN files a dissenting opinion.

Justice SAYLOR, concurring.

I support the lead Justices' decision to direct a hearing to determine the present status of the adoption petition.

I am not comfortable, however, with the lead opinion's factual treatment, as it substantially intermixes Mother's personal perspective with the much more circumscribed factual findings of the orphans' court. For example, certainly, from Mother's vantage, Father pursued the repeated physical examinations of L.J.B. as a tactic to gain leverage in the custody litigation. Father testified, however, and there is some corroborative evidence, that the examinations began on account of a urinary tract infection. *See, e.g.,* N.T., Feb. 10, 2006, at 21–22. *See generally* N.T., Nov. 24, 2004, at 7–9 (reflecting positive culture results and the orphan's court's remark: "I'm satisfied [L.J.B.] had a yeast infection back last year in 2003 and that [a doctor] initially didn't pick it up."). The possibility arises-and there are no determinations by a fact-finder to discount it-that at least some of the fixation leading to the unfortunate course of events pertained to the dispute, between Mother and Father, as to whether there were ongoing medical concerns.[1] Additionally, Father and Stepmother testified that they were told, by L.J.B., that she suffered from discomfort and there had been some touching on Mother's part. *See* N.T. Nov. 24, 2004, at 10–12; N.T., Feb. 10, 2006, at 24–25, 48; N.T., Apr. 30, 2009, at 67. Although there is a finding that there was no sexual misconduct on Mother's part, there is no finding that she did not examine her daughter in light of Father's expression of continuing concerns over the possibility of an infection. Nor is there any determination that some of the controversy, at least, could not have been due to misunderstandings (rea-

1. The record shows a similar pattern of arguably disproportionate concern on Father's part following an incident in which L.J.B. suffered from head lice. *See* N.T., Feb. 10, 2006, at 28–30, 34–40, 56, 71–75; N.T., Mar. 2, 2006, at 19–21; N.T., Apr. 30, 2006, at 87–88.

sonable or unreasonable) rather than the deeper malice depicted in the majority opinion.

The dissolution of a family is rarely pleasant, and, in light of inherent limitations, it is very difficult for a court of law—especially an appellate court—to attain a full appreciation of the dynamics of resultant disputes. In my view, this particular controversy does not require the Court to delve so deeply into facts which have not been concretely addressed by the orphans' court to arrive at the rather straightforward conclusion that the matter is likely moot.

Finally, I have no quarrel with the thinking that it would be beneficial at this stage in this protracted controversy to have L.J.B.'s circumstances evaluated by a "fresh pair of eyes." Opinion Announcing the Judgment of the Court, at 1113. Along the lines of my thoughts above, however, I see deeper context to some of the examples of impropriety being attributed to the custody judge. While I find it clear that some of the judge's extemporaneous remarks were ill-informed and intemperate, I am not certain they reflect actual bias, albeit I do acknowledge the appearance issue they have created.

Chief Justice CASTILLE joins this Concurring Opinion.

Justice TODD, concurring and dissenting.

This Court has designated the instant case as a "fast-track" appeal, reflecting this Court's philosophy that matters involving children should be resolved as expeditiously as possible and without undue delay. Here, the record suggests that Mother has not seen L.J.B. in almost five years, and a remand for further proceedings, as proposed by the Opinion Announcing the Judgment of the Court ("OAJC"), undoubtedly will prolong even further the uncertainty which has plagued both Mother and L.J.B. Accordingly, while I agree with the OAJC that, where there is evidence to suggest that an action has become moot, the preferred approach generally is to resolve that question by remand or otherwise before addressing the merits, in my view, a remand is inappropriate in the instant case.

Based on my exhaustive review of the record in the instant case, I join the views of Justice Orie Melvin and Justice Eakin, as set forth in their respective Dissenting Opinions, that there is substantial and sufficient evidence to support Mother's claim that her efforts to maintain contact with L.J.B. were continually frustrated by Father. Moreover, I agree with Justice Orie Melvin that the Superior Court erred in failing to properly consider such evidence, focusing solely on Mother's failure to seek court intervention, rather than the totality of the circumstances, as required. Given this record, and in light of our self-imposed charge to resolve matters involving children expeditiously, I see no reason to further delay resolution of this matter by remanding to the trial court for determination of mootness, and would simply reverse the order of the Superior Court.

I do, however, join in the OAJC's determination that, based on the peculiar facts and procedural history of this matter, any further proceedings with regard to L.J.B. should be presided over by a new jurist from a different judicial district, as appointed by the Administrative Office of Pennsylvania Courts.

Justice EAKIN, dissenting.

I respectfully dissent, as a remand for a determination of mootness appears to me to be a pointless gesture. We have everything we need to answer the very simple question presented for our review, which the Opinion Announcing the Judgment of the Court (OAJC) implicitly recognizes by virtue of its very detailed opinion. With this foundation in place, we very easily and succinctly could decide the merits of this case.

I would hold the order terminating Mother's parental rights was not supported by competent evidence and should be reversed—the record and the OAJC's abbreviated analysis compel this result. If that is true, a remand accomplishes nothing. The parties would be returned to the exact position they were in before the trial court's ruling; Mother's right would be intact.

If the trial court finds the impetus for the petition to terminate rights is no longer in place, then the most that court can do on remand is not terminate Mother's rights, a result we can accomplish now. Conversely, if the trial court finds termination is still in play, the case will simply be returned to us to rule on the issue already before us, unenhanced by additional evidence. Remand accomplishes nothing.

Remand consumes significant judicial resources and the parties' time by essentially asking if we should still decide the case. And this is not a straightforward remand, as a judge from another judicial district is ordered to decide the matter, with all the logistical limitations and additional delays inherent in such an order. Having gone three-quarters of the way to deciding this case on the merits, and with a result on the merits apparent from the analysis, a retreat because of a fear of mootness does everyone more harm than good, and without an availing difference from the result we can, and should, reach now.

Accordingly, I respectfully dissent.

Justice ORIE MELVIN, dissenting.

This appeal by allowance was granted to address the propriety of the March 10, 2010 opinion and order of the Superior Court that affirmed the May 27, 2009 decree terminating the parental rights of C.L.F. ("Mother") to L.J.B. ("Child"). My exhaustive review of the record compels my conclusion that the termination decree is not supported by clear and convincing evidence and must be reversed. The practical effect of that reversal ends this case. In my view, the consideration of matters by the Opinion Announcing the Judgment of the Court ("OAJC"), that occurred subsequent to the entry of the appealed order is unnecessary, improper, and unwise. At this juncture, it is irrelevant whether Stepmother ultimately intends to adopt L.J.B. because the termination decree cannot stand. A remand adds nothing to the proper disposition of this case, serves only to burden the parties and the courts with unnecessary litigation, and fails to properly address the only issue before us.

My exhaustive review of the record in this matter compels one conclusion: that the decree terminating Mother's parental rights must be reversed. Mother and S.M.B. ("Father"), who never married, resided together at the time of Child's birth on August 27, 2001. They separated during the summer of 2002 when Child was eleven months old; Father then married W.B. ("Stepmother") in November of that year. Shortly thereafter, Father filed a custody complaint, and the contentious litigation described *infra* ensued. From the date of separation through March 13, 2006, Child resided primarily with Mother; Father's partial custody increased from two evenings per week and alternating weekends to a sixty-forty percent split in favor of Mother.

On December 18, 2008, Father and Stepmother filed a petition to adopt Child, who was then seven years old, and sought to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (2). The orphans' court held a hearing on the termination petition on April 30, 2009, wherein Father and Stepmother testified in support of the petition, and Mother, Child's four half-siblings, and B.B., the maternal grandmother ("Grandmother") testified in opposition. The orphans' court interviewed Child in chambers in the presence of counsel on May 5, 2009, at which time Mother requested a formal bonding evaluation. Following argument, that request was denied. Child's guardian *ad litem* ("GAL") filed a report on May 26, 2009 opining that it was in Child's best interest to terminate Mother's parental rights.

By decree dated May 27, 2009, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (b), determining that, while Father obstructed Mother's contact with Child, Mother failed to take requisite affirmative steps to overcome the obstacles placed by Father. The orphans' court also ruled that no bond existed between Mother and Child. Accordingly, it concluded that termination of Mother's parental rights and adoption of Child by Stepmother would best serve Child's needs and welfare. Mother appealed to the Superior Court.

In a memorandum decision, the Superior Court affirmed the termination of parental rights. *In re Adoption of L.J.B.*, No. 1097 MDA 2009, 996 A.2d 562, unpublished memorandum (Pa.Super., filed March 10, 2010). We granted Mother's petition for allowance of appeal, and, following remand to the orphans' court for an assessment of whether Mother was entitled to *in-forma-pauperis* status, the case was submitted to us on the briefs.

The record substantiates the following pertinent facts, which I detail here because they bear on the only relevant issue before us: the propriety of the order terminating Mother's parental rights. Throughout the custody proceedings [1] that preceded the instant action, Father repeatedly reported to Clinton County Children and Youth Services ("CYS") that Mother sexually abused and neglected Child. Beginning when L.J.B. was two years old, Father requested that Child undergo pelvic examinations, which occurred on "at least eight" occasions. N.T., 2/30/09, at 143; N.T., 2/10/06, at 22. Mother filed two petitions for contempt seeking protective orders preventing Father's initiation of unnecessary pelvic examinations of L.J.B. N.T., 4/30/09, at 180. During the first contempt proceeding, the custody court told Mother that Father, "as a parent, has every right to ruin [Child's] life," and it denied the contempt. *Id.* The court apparently did not hold Father in contempt pursuant to the second petition either. Instead, it issued a statement in its October 20, 2003 order addressing Father's cross-petition for modification of custody that "the parties' [2] practice of taking the child to medical practitioners at the end of each custodial period [for the

1. The orphans' court incorporated testimony from portions of the custody proceedings, on November 24, 2004, February 10, 2006, March 2, 2006, and July 11, 2007, into the instant record. N.T., 4/30/09, at 137, 224. The complete custody record, however, was not admitted in the termination proceedings, and the complete record has not been certified to us on appeal. As represented by the OAJC, I recite only "that which is in the record presently before us." OAJC at 1102 n. 2.

2. It appears the court directed the prohibition to the parties rather than Father individually because Mother had taken Child to the doctor in 2003, albeit upon Father's demand and insistence that Child had a yeast infection, and Child underwent a pelvic examination at that time. N.T., 4/30/09, at 144.

purpose of pelvic examinations] must stop." Order, 11/9/04, at 1–2 (referencing the prior October 20, 2003 order). A November 22, 2004 memorandum to the custody court from CYS caseworker Dennis E. Wilson substantiated the dearth of evidence "to suggest that the child has been sexually or emotionally abused" and advised that "[c]ontinued vaginal examinations of the child without medical necessity are not recommended." CYS Memorandum, 11/22/04, at 2. Mr. Wilson also read a January 20, 2005 CYS memorandum into the record, which stated in pertinent part:

> Clinton County Children and Youth agrees with the medical professionals in this case that the examinations and cleanings of the child's vagina need to stop. The Agency will open an abuse investigation if [Father and Stepmother] continue to have the child unnecessarily examined or cleaned. The Agency will also request a temporary change in visitation during the course of the investigation.

N.T., 2/10/06, at 43. Father testified that Child had been under the care of two different pediatricians, Dr. Henry Dietrich and Dr. Thane Turner. N.T., 4/30/09, at 56. Dr. Dietrich sent a letter to the custody court stating, "Dr. Henry Dietrich's medical opinion concurs with Dr. Thane Turner's opinion from 11/22/04 that [Father and Stepmother] need to stop. Clinton County Children and Youth agrees with the medical professionals in this case that the examinations of the child's vagina need to stop." Id. at 57. Six or more professionals investigated the allegations over the years, and **none** of them found any evidence of sexual abuse. Undeterred, two days after filing a petition for primary custody, Father and Stepmother once again ignored the October 20, 2003 order and took Child on January 25, 2006 to the Jersey Shore Hospital emergency room where she underwent yet another vaginal examination. N.T., 2/10/06, at 24. During that examination, which likewise revealed no abnormalities or indications of sexual abuse, color photographs of Child's genitals were taken. Id. at 32. The custody court found as a fact that CYS determined all of Father's reports of abuse or neglect were

unfounded. The court clearly was exasperated by Father's behavior, as evidenced by its comments:

> I'm making a specific finding that there was absolutely nothing physical or verbal observed or heard by the people at the Jersey Shore Hospital that would have suggested there was any reason in the world that this child shouldn't have been in bed in her own home and not at the Jersey Shore Hospital with her legs spread apart taking a picture of her vaginal area. Now don't go on it anymore. Let's move onto something else.

N.T., 2/10/06, at 49. Despite the court's frustration, it failed to enforce its prior order and halt Father's repeated detestable behavior. *See* Orphans' Court Opinion, 5/27/09, at 4.

Mother testified that when Father subjected Child to yet another vaginal examination and photography of her genitals, on January 25, 2006, and the custody court failed to enforce its prior order proscribing such behavior, she felt compelled to protect Child in whatever manner she could. Thus, on March 13, 2006, Mother relocated to Tennessee[3] in an effort to eliminate five-year-old L.J.B.'s continued exposure to Father's sexual exploitation through repeated unnecessary pelvic examinations that lacked any medical foundation. Mother explained that L.J.B. asked, "[W]hy did they do that to me? Why did my daddy let them do that to me?", to which Mother responded, "[I]t's not going to happen no [sic] more. I'm not going to let that happen to you any more." N.T., 4/30/09, at 167. Mother reasoned:

> I waited for [the custody judge] to issue an Order stopping the vaginal exams. He did not issue an Order.... Children and Youth had sent a memo and stated specifically that if they had any more exams done to [L.J.B.], that they would stop [Father's] visitation immediately. And they did not enforce their memo. [The custody judge] did not do anything to stop [L.J.B.] from having any more exams.

---

**3.** Mother testified that she previously had moved forty minutes away from the area, "and it didn't stop [Father]." She maintained that she "could have probably moved to Timbuktu.... It didn't matter where I lived if he had primary custody, I thought [the vaginal examinations] would stop." N.T., 4/30/09, at 193.

And after they had pictures taken of her privates, I just could never allow that to go on no [sic] more.

N.T., 4/30/09, at 143. Mother explained that "[i]t just ripped out my heart. I couldn't believe that [Father and Stepmother] would put her through that.... I'm her mom. I'm supposed to protect her.... I thought once [Father and Stepmother] had primary custody and I had just visitation once a month, everything would stop." *Id.* at 148–49. Mother stated that she "would do anything to prevent [Child] from having those exams again, if it meant that I could never see her again." *Id.* at 182. Mother further represented that as she had anticipated, Child did not undergo any such examinations following Mother's relocation, a fact substantiated in the record by Stepmother. *Id.* at 67. After Mother moved, the custody arrangement was modified to give Mother partial custody one weekend per month. Apparently, Father remained dissatisfied with this level of contact with Mother, and he admitted that he wanted "[M]other out of [Child's] life." *Id.* at 21.

Upon Mother's relocation, she also was entitled to telephone contact with Child every Thursday at 8:00 p.m. Father, however, placed all telephone calls between Mother and Child on speakerphone "to hear what was going on." *Id.* at 27, 149. Mother explained that Child, although initially happy when Mother called, "couldn't freely talk to me." *Id.* at 149. Mother testified that Father and Stepmother would comment to Child while Mother attempted to converse with her; Father claimed that L.J.B. eventually stopped wanting to talk to Mother at all. *Id.* at 27, 149. Father told Mother that Child did not want to speak to her and invariably hung up on Mother. *Id.* at 153. The orphans' court found that when Mother attempted to telephone Child on Mother's Day by having her son place the call, upon Child's obvious glee at speaking to Mother and revelation that "mommy's on the phone," Father hung up the telephone, telling Mother, "Wrong day," because it was a Sunday, not a Thursday. *Id.* at 154; Orphans' Court Opinion, 5/27/09, at 6–7. Additionally, Stepmother threatened Mother with harassment for calling Child

on her birthday, after hanging up on Mother every time she tried to call. N.T., 4/30/09, at 153–54. Stepmother acknowledged that she "possibly did [threaten her] at one point." *Id.* at 88. Mother admitted that after she was threatened with harassment for telephoning, she did not try to call again after August of 2007. *Id.* at 160. As explained *infra*, Mother had reason to fear such threats based upon Father's role in initiating an incident that resulted in Mother being jailed. *See In re J.G.J., Jr.*, 367 Pa.Super. 425, 532 A.2d 1218 (1987) (non-custodial parent's failure to telephone to inquire about son was understandable following accusation by custodial parent, who was seeking involuntary termination of parental rights, that non-custodial parent was making threatening telephone calls).[4]

From March through November 2006, Father permitted Child to visit Grandmother on a monthly basis. Unbeknownst to Father, Grandmother permitted Mother to speak to Child on the telephone during those visits and gave Child cards and gifts from Mother. During one of those telephone calls, Child told Mother "that her dad told her she was never, ever going to see me again." N.T., 4/30/09, at 155. Grandmother held a birthday party for Child in August 2006, and Mother drove from Tennessee so that she could see Child there. When L.J.B. learned that Mother was on her way, Child became upset, telling Grandmother that she was "not allowed to visit with [her] mother," and "she was going to get in trouble." *Id.* at 118, 156. Grandmother became "afraid and took [L.J.B.] back to [Father] and [Stepmother]." *Id.* Mother testified that she tried to contact Child through Grandmother's e-mail. She sent Child an e-mail through Grandmother, who printed it, read it to L.J.B., and gave it to her, but Child "stuffed it in the seat" on the way to Father's home. When Grandmother reminded Child that she forgot her letter, Mother explained that Child "thought she was going to get in trouble if she had

---

4. Both Mother and her seventeen-year-old son testified that Father carried a loaded handgun during the custody exchanges of L.J.B. and insisted on taking Child to Mother's home, despite a court order mandating drop-off and pick-up in a public location. N.T., 3/2/06, at 38; N.T., 11/24/04, at 19. Father admitted carrying a "loaded .357 handgun on his front seat." N.T., 4/30/09, at 46.

the letter when she went home." *Id.* at 198. Upon learning that Grandmother permitted communication with Mother, Father demanded that Grandmother promise not to allow Child to speak or see Mother during the visits. Grandmother refused and filed a petition for visitation. While the custody court initially permitted Grandmother to have supervised visits, it eventually issued an order ceasing them.[5]

Mother last visited with Child in December of 2006, nearly a year after she moved from Pennsylvania, when she was forced to seek the custody court's intervention because Father continued to prohibit all contact with Mother. Despite Mother's entitlement to unsupervised weekend partial custody, she was relegated to a two-hour visit at a McDonald's Restaurant where Father and Stepmother remained, observing the visit. Father admitted that the authorization for the two-hour visit "came from [the custody judge]." N.T., 4/30/09, at 215. In 2007, Mother delivered Easter presents to Child through her son and delivered Christmas presents to Child through Grandmother. In August 2008, Grandmother sent Child a birthday card signed by Mother that Father returned.

Mother testified that she provided no gifts to Child after 2007 because Father refused to permit Child to have them. The orphans' court found as fact that Father and Stepmother "instructed the Child to call Stepmother 'mother' and Mother [by her first name]." Orphans' Court Opinion, 5/27/09, at 7. Mother explained that she did not seek further court intervention because it became clear to her based upon the court's refusal to enforce even her monthly weekend custody that such efforts on her part would be futile.

Mother also became intimidated by the power of the custody court and the perceived relationship between the custody court and Father. In support, Mother noted that when she moved from the initial relocation address in Tennessee, she apparently had been mailed notice of an order directing payment of a $50.00 fee to Robert Meacham, the court-

5. The custody court's hostility toward Mother and Grandmother is apparent in the record. *B.J.B. v. S.M.B.*, No. 818–07; N.T., 7/11/07 ("Grandmother visitation"), at 9–11.

appointed psychologist. While she never received that notice, she subsequently learned that a warrant had been issued due to its nonpayment. Mother, therefore, directed her son to pay the bill following which the court order was rescinded in September 2007. N.T., 4/30/09, at 151. When Mother drove to Pennsylvania in August 2008, she passed Father on a road near his house, and, shortly thereafter, a Lock Haven Police Officer began following her. Father himself testified that he "was told by [the custody judge] to call if I saw her in the area," and he did so. *Id.* at 218; *see also* N.T. Grandmother visitation, 7/11/07, at 8 ("I would suggest the next time you find her in Clinton County you call the Sheriff and they'll pick her up."). Despite the fact that the fee had been paid and the order had been rescinded, police stopped Mother's vehicle, removed her from the car, handcuffed her while her other children watched, and took her to jail, where she was forced to spend the night. N.T., 4/30/09, at 152. Mother concluded from this experience that, if the court would not enforce its order prohibiting pelvic examinations of Child and yet freely advised Father to notify it if Mother appeared in Pennsylvania so that she could be taken into custody, she had no hope of getting court-ordered relief.

Mother explained that Father wrote *ex parte* letters to the custody court that resulted in court hearings even though no formal petition or motion had been filed. N.T., 4/30/09, at 168. Indeed, a December 1, 2004 order by the custody court substantiates this claim. Order, 12/1/04, at 1 (footnote omitted)("On November 9, 2004, we received a lengthy unsigned letter from Father raising numerous concerns about [L.J.B.]'s care. We immediately scheduled a hearing . . . ."). Moreover, in the proceeding Grandmother instituted seeking visitation, which was heard by the same custody judge, the court opined, "[Father] won't let [Mother] see [L.J.B.] because her mother ran off and abandoned her." When Grandmother protested that Mother did not abandon Child, the judge went on, "I'm surprised [Father] hasn't filed a petition to have [Mother's] rights terminated." N.T., 4/30/09, at 169; N.T. Grandmother visitation, 7/11/07, at 11. The court told Grandmother,

"[Y]ou're in the situation you're in because your daughter's conduct has been absolutely reprehensible for the last ten years," even though Child was only five years old at the time, and the parties had been before the judge only for the prior three years. *Id.* at 9. Mother concluded from these comments, "[The custody judge] doesn't like me. [Father] was in Contempt of Court and took [Child] for a vaginal exam, and nothing was done. But I didn't pay a $50 psychologist[']s bill, and I ended up in jail." N.T., 4/30/09, at 169. Mother indicated that she tried everything she could think of to enforce her rights including attempting to see Child through Grandmother, all to no avail. *Id.* at 187.

Mother revealed that she sought legal advice upon relocating to Tennessee to attempt to enforce her partial custody rights there. She was advised by a Tennessee attorney that while he could assist her in getting a temporary protective order for Child from further vaginal exams, the matter ultimately would be heard again before the same trial judge in Pennsylvania. *Id.* at 157. Based on her court experience, and in light of Father's obstruction of her relationship with Child, Mother concluded that Father simply wanted her "out of [Child's] life completely." *Id.* at 204. As noted *supra,* Father admitted as much. *Id.* at 21.

Mother asserts, *inter alia,* that the lower courts [6] erred in concluding that Father met his burden of proving that Mother evidenced a settled purpose of relinquishing her parental claim to L.J.B. or refused or failed to perform her parental duties, in light of extensive evidence of record that Father obstructed Mother's efforts to maintain her place in Child's life. I agree. As I find merit in this issue, it is unnecessary to address Mother's other contentions regarding section 2511(a).

---

**6.** Neither opinion below mentions Mother's payment of support for Child, but there was some discussion about it at the termination hearing. Mother stated that she voluntarily attempted to pay Father outright, but "[h]e wouldn't accept it. He laughed at me, and he wouldn't let me see her." *Id.* at 184. Ultimately, child support for L.J.B. was deducted from Mother's wages. *Id.* at 183. While payment of support, alone, is not sufficient to establish that one is performing parental duties, it certainly is a factor to consider. *See In re Burns,* 474 Pa. 615, 379 A.2d 535 (1977).

The orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (b), which provide, in relevant part:

### § 2511. Grounds for involuntary termination

(a) **General rule**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . . .

(b) **Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child . . . .

Initially, the focus is on the parent's conduct. *In re L.M.*, 923 A.2d 505 (Pa.Super.2007).

Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. *Baby Boy A. v. Catholic Social Services*, 512 Pa. 517, 517 A.2d 1244, 1246 (1986). Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child **or** fails to perform parental duties.

*In the Matter of Adoption of Charles E.D.M.*, 550 Pa. 595, 708 A.2d 88, 92 (1998)(emphasis in original). Only if the court determines that the parent's conduct satisfies subsection (a) does it then engage in the second part of the analysis pursuant to section 2511(b).[7] *Id.; see also L.M., supra.*

The OAJC has detailed the relevant scope and standard of review. In affirming the decree terminating Mother's paren-

7. Since the lower courts erred in determining that Mother's conduct, in light of the totality of the circumstances, satisfied 23 Pa.C.S. § 2511(a), it is not necessary to evaluate subsection (b). *Charles E.D.M., supra.*

tal rights, the Superior Court determined that "Mother's failure to seek court intervention in order to protect her partial custody rights after relocating to Tennessee is fatal to her claim." *In re Adoption of L.J.B., supra* (unpublished memorandum at 12). I believe this critical error in the Superior Court's reasoning compels reversal of this case.

It is not disputed that there was a period in excess of six months wherein Mother and Child had no contact. In concluding that Mother failed to affirmatively exert her parental rights to overcome the obstacles placed by Father, however, the courts below failed to give due consideration to Mother's situation and her explanations for her responsive actions. The obstacles placed by Father in this case were shameful, systemic, and sustained. Most offensive, to be sure, was his exposure of this young child to repeated vaginal medical examinations. The orphans' court's explicit finding that Mother did not affirmatively attempt to overcome the multiple obstacles erected by Father is not supported in the record and ignores the critical fact that Father and Stepmother actively spurned all of Mother's efforts to remain in Child's life. Father should not be rewarded for such conduct. *See, e.g., In re Adoption of C.M.W.*, 412 Pa.Super. 360, 603 A.2d 622 (1992) (parent's reasonable attempts to overcome obstacles created by parent seeking to terminate parental rights were sufficient); *In re B.N.M.*, 856 A.2d 847, 856 (Pa.Super.2004)(court must consider custodial parent's devious, deliberate creation of barriers "intended to impede free communication and regular association between the non-custodial parent and his or her child").

The Superior Court's sole emphasis on the fact that Mother did not seek court intervention following her relocation to Tennessee as the exclusive basis for affirming the termination decree is clear error. *See In re D.J.Y.*, 487 Pa. 125, 408 A.2d 1387, 1390 (1979) (where a parent makes reasonable attempts to overcome obstacles created by the party seeking termination, the fact that the parent could conceivably have pursued legal action more promptly does not, standing alone, justify termination of parental rights); *see also Adoption of M.S.*, 445 Pa.Super. 177, 664 A.2d 1370, 1374 (1995)("Where a parent

makes **reasonable** attempts to overcome obstacles created by the party seeking to terminate parental right, 'a mere showing that the parent could conceivably have pursued legal action more promptly cannot justify termination of parental rights' " (emphasis in original)(quoting *Adoption of C.M.W.*, 603 A.2d at 625)). Moreover, the few cases from this Court that address the propriety of orders involuntarily terminating parental rights, and the myriad of cases from the Superior Court that do so, all reinforce that:

> [i]t is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence **in light of the totality of circumstances** clearly warrants termination. *In re Bowman*, 542 Pa. 268, 666 A.2d 274 (1995)(Zappala, J., Opinion in support of Reversal); *In re K.C.W.*, 456 Pa.Super. 1, 689 A.2d 294 (1997); *Adoption of Dale A.*, 453 Pa.Super. 106, 683 A.2d 297 (1996); *Adoption of Hamilton*, 379 Pa.Super. 274, 549 A.2d 1291 (1988).

*Charles E.D.M.*, 708 A.2d at 91 (emphasis added). Herein, the Superior Court elevated Mother's failure to continue to seek court intervention above all other considerations despite the fact that it was merely one of a myriad of factors it was required to consider.

We emphatically have held in situations such as this, where the custodial parent has prevented the parent whose rights are subject to termination from performing parental duties, parental performance is to be measured in light of what reasonably would be expected of an individual in similar circumstances, giving due consideration to obstacles encountered. *See In re Adoption of J.S.M., Jr.*, 492 Pa. 313, 424 A.2d 878 (1981); *D.J.Y., supra;* and *In the Matter of the Adoption of David C.*, 479 Pa. 1, 387 A.2d 804 (1978).

Nearly thirty years ago we addressed the issue of obstructive conduct by a custodial parent in *Adoption of B.D.S., supra.*[8] In that case, the child's mother, who was the custodi-

---

8. While *B.D.S.* proceeded under the prior Adoption Act of 1970 and predated our requirement of proof by clear and convincing evidence,

al parent, obstructed the father's relationship with their minor child, B.D.S., and sought to terminate the father's parental rights so that her new husband could adopt the child. Both the mother and her husband testified that the father and his family never contacted them about B.D.S. after 1973 but on cross-examination admitted receiving the father's request for a visit in November 1973 and an Easter basket for the child in 1974. The father, who was on active duty in the Marine Corps, conversely testified that during the prior three and one-half years, all of his attempts to see his son were thwarted by his ex-wife. The father went to Legal Aid, but, since he did not meet the income guidelines, he did not initiate legal action to enforce his parental rights. Additionally, he was intimidated by a prior incident that resulted in the filing of an action before the district magistrate, which lent credence, in the father's view, to his former father-in-law's threats that he not set foot on their property, which is where his son had been residing.

Based upon this testimony, the orphans' court concluded that the mother's actions prevented the father from maintaining a parental relationship with B.D.S., and it refused to terminate his parental rights. In affirming the orphans' court, we examined a similar pattern of barriers in *Adoption of S.H.*, 476 Pa. 608, 383 A.2d 529 (1978), and reaffirmed our admonition in *S.H.* that a parent will not be found to have refused to perform parental duties or evidenced a settled purpose of relinquishing parental claim to a child as long as he uses all available resources to preserve the parental relationship and exercises reasonable firmness in declining to yield to obstacles. *B.D.S.*, 431 A.2d at 207 (citing *S.H.*, 383 A.2d at 530). Similarly, we referenced *D.J.Y.*, *supra*, wherein we determined that the natural mother's failure to maintain contact with her child "was attributable to the paternal grandparents'

instead utilizing a standard of preponderance of the evidence, *see In re Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883 (1986), this Court's analysis and admonition therein are undiluted by those variations and remain vital and relevant today. Moreover, the obstructive conduct displayed in *B.D.S.* pales in comparison to the pattern of behavior exhibited by Father herein.

deliberate actions designed to thwart her attempts to contact her child." *B.D.S.*, 431 A.2d at 207.

The cornerstone of *B.D.S.* I underscore today is that while a parent must make a concerted, deliberate effort to maintain contact with her child, "all circumstances must be considered when analyzing a parent's performance or non-performance of parental obligations." *Id.* (citing *In re R.W.B.*, 485 Pa. 168, 401 A.2d 347 (1979)). Further, where there are allegations that the custodial parent exhibited obstructive conduct, a parent's performance must be measured in light of "what would be expected of an individual in [similar] circumstances...." *B.D.S.*, 431 A.2d at 207 (citing *Adoption of David C.*, 479 Pa. 1, 387 A.2d 804 (1978)). In *B.D.S.*, we issued "a stern warning" that a non-custodial parent's responsive behavior to obstructive conduct by a custodial parent would not be utilized as a sound basis for the involuntary termination of parental rights. *B.D.S.*, 431 A.2d at 208.

Assuredly, parents have a primary right to their children. *See Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) ("[T]he interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by this Court"); *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (discussing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"). The power of the court to extinguish this right, however, is statutory. *In re Adoption of R.B.F.* 569 Pa. 269, 803 A.2d 1195 (2002); 23 Pa.C.S. § 2511; *see also In re Adoption of J.M.*, 991 A.2d 321 (Pa.Super.2010)(Adoption is strictly a creature of statute with no roots in common law). "The purpose of involuntary termination of parental rights is to dispense with the need for parental consent to an adoption when, by choice or neglect, a parent has failed to meet the continuing needs of the child. *See e.g., In re Adoption of Orwick*, 464 Pa. 549, 347 A.2d 677 (1975); *In re Adoption of McCray*, 460 Pa. 210, 331 A.2d 652 (1975)." *In re B.E.*, 474 Pa. 139, 377 A.2d 153, 156 (1977). Absent consent, parental rights may be terminated only upon clear and convincing

evidence of the statutory criteria. *Santosky; In re T.R.*, 502 Pa. 165, 465 A.2d 642 (983).

If anything in this record can be characterized as supported by clear and convincing evidence, it is that Father, who bore the burden of proof, engaged in a persistent pattern of conduct designed to erase Mother from Child's life and substitute Stepmother for Mother in Child's eyes. The sole basis highlighted by the Superior Court in refusing to give credence to all of Mother's continued efforts to perform parental duties rested upon Mother's failure to pursue court intervention after 2007. Indeed, Mother acknowledged that she did not continue legal intervention after the custody court failed to enforce its orders prohibiting Child's repeated pelvic examinations and permitting Mother's weekend partial custody following her relocation from Pennsylvania. No one—not Father, the GAL, the orphans' court, or the Superior Court—has explained how Mother was to maintain contact with Child, let alone assert prominence in her life, in the face of Father's unfounded allegations of sexual abuse, heinous exposure of this young child to multiple vaginal examinations, and abhorrent interference in the mother-child relationship. A parent is not required to perform the impossible. *In re G.P.-R.*, 851 A.2d 967 (Pa.Super.2004) (citing *In re Burns, supra* ). The instant case is not one involving a meager, minimal effort by Mother to resist Father's significant obstacles; rather, the record reveals Mother's genuine, sincere efforts to maintain a place of importance in L.J.B.'s life. Could Mother have successfully continued to initiate legal proceedings despite the custody court's refusal to enforce its prior orders? Possibly. *See Adoption of C.M.W.*, 603 A.2d at 625 (focus of 23 Pa.C.S. § 2511(a)(1) is not whether person is model parent but whether parent has shown clear intent to relinquish his parental rights). Our case law, however, compels that we examine the **reasonableness** of Mother's actions in light of the totality of the circumstances. It is this aspect of reasonableness that the Superior Court ignored. As this Court made clear in 1982, obstructive behavior by the custodial parent "aimed at thwarting the other parent's maintenance of a parental relationship will not be

tolerated, and certainly will not provide a sound basis for the involuntary termination of parental rights." *B.D.S.*, 431 A.2d at 208.

Reversal of this unsupported decree ends this matter. The OAJC's remand is supererogatory and is based upon two letters espousing mere possibilities that were written to the orphans' court after entry of the final decree.[9] On November 25, 2009, six months after the orphans' court terminated Mother's parental rights, the orphans' court observed that it received a letter from the guardian *ad litem* indicating that Father and Stepmother "split up and currently intend on divorcing," and it forwarded that letter to the Superior Court. The letter indicated that Father "would like [Stepmother] to proceed with the adoption[,]" but Stepmother "appears to have some concerns in this regard." Letter from David I. Lindsay, Esquire, to Hon. Craig P. Miller, 11/16/09. Similarly, two months later on January 29, 2010, the orphans' court forwarded a letter it received from Stepmother dated January 22, 2010, in which Stepmother communicated uncertainty concerning her ability to proceed with her adoption of Child.

In relying upon the GAL's and Stepmother's post-decree letters to the orphans' court, the OAJC suggests that "the factual circumstances of this case certainly reflect the drastic change in circumstances." OAJC at 1108. I observe there truly are not any "drastic change[s] in circumstance" that prevent our review of the propriety of the decree terminating Mother's parental rights, which is the only matter before us. Indeed, the OAJC acknowledges that "neither the docket nor the certified record reflects a formal praecipe or petition on Stepmother's behalf withdrawing her petition for adoption[,]" and the record displays an "absence of a formal praecipe or discontinuance." *Id.* at 1108, 1109. The OAJC's suggestion that "the petition for termination of Mother's rights **is potentially moot**" is a tacit acknowledgment that it **presently** is not

9. Contrary to the OAJC's suggestion, I do not assail consideration of the post-decree letters. *See* OAJC at 1110 n. 12. It is the OAJC's **reliance** upon them to remand, in the absence of any formally-filed document, with which I take issue, in light of the completeness of the instant record to decide the issue before us.

moot. OAJC at 1109 (emphasis added). While it is true that a legal question can become moot as a result of changes in the facts of the case or in the law, "such changes must finally and conclusively dispose of the controversy, and where they do not, the case is not moot." Kane, Rachel, *2 Standard Pennsylvania Practice 2d* § 6:49 (2011); *National Development Corp. v. Planning Commission of Harrison Twp.*, 64 Pa. Cmwlth. 246, 439 A.2d 1308, 1310 (1982) (citing *In re Gross*, 476 Pa. 203, 382 A.2d 116 (1978)).

The OAJC cites *In re B.E.*, 474 Pa. 139, 377 A.2d 153, 155 (1977), *In re T.R.*, 502 Pa. 165, 465 A.2d 642 (1983), and 23 Pa.C.S. § 2512 in support of the proposition that a parent may file a petition for termination of parental rights against the other parent only when adoption is contemplated and, presumably, as authority for its remand decision. OAJC at 1107–08, 1109. While I have no disagreement with the first proposition, I discern no authority from those cases for the instant remand. It is important to note the procedural and substantive differences in each of these cases. In *B.E.*, unlike here, the petition did not contain an "averment that adoption proceedings with respect to the Child were contemplated." *Id.* at 154. In fact, the petitioning mother admitted that she had "no plans to have the child adopted by a stepparent or any other person." *Id.* Consequently, the trial court, in the first instance based upon evidence of record, properly rejected her petition. In *T.R.*, the trial court in reaching its decision to terminate applied the preponderance of the evidence standard of proof. On appeal, this Court determined that the proper standard of proof, in accord with *Santosky v. Kramer, supra*, was clear and convincing evidence. Thus, we vacated the termination decree and remanded for a new termination hearing applying the proper standard.

In contrast, when Father and Stepmother filed the instant termination petition, adoption by Stepmother was contemplated. When the case was decided by the trial court (under the proper standard) and appealed to the Superior Court, the record establishes that adoption by Stepmother was contemplated. When this Court granted Mother's petition for allow-

ance of appeal, the record substantiates that adoption by Stepmother was contemplated. Currently, the record confirms that adoption by Stepmother was contemplated, as neither Stepmother nor Father has filed any formal documents averring otherwise. Indeed, the OAJC acknowledges that a "final decision regarding mootness cannot be made by this Court upon this record." OAJC at 1109. Hence, I submit that the mere assertion of changed circumstances is an insufficient basis to invoke this prudential rule, which requires the changes to "finally and conclusively dispose of the controversy." *National Development Corp.*, 439 A.2d at 1310.

"Notwithstanding the absence of a formal praecipe or discontinuance," OAJC at 1109, the OAJC suggests that it is imprudent to render a decision on the merits, despite implying the propriety of such a result. Instead, it "vacate[s] the order of the Superior Court and remand[s] ... to the court of common pleas for an immediate evidentiary hearing to determine if the instant action is now moot," based upon mere assertions made in *ex parte* letters that were subsequently made part of the record, and directs the court to dismiss this matter if it determines that Stepmother has changed her mind about adopting L.J.B. OAJC at 1101, 1113. If not based on the merits of these mere assertions, on what basis does the OAJC vacate the Superior Court order? The OAJC has envisioned only one resolution herein, and it unnecessarily leaves Mother and Child in a state of flux if Father's and Stepmother's intentions have not changed. The OAJC is deafeningly silent concerning where this case stands if Father and Stepmother intend to proceed with adoption, which, as I have established, is in accord with the **formal** record as it exists today. Mother has proceeded through her direct appeal, and this Court has wisely chosen to grant discretionary review. The briefs have been filed, considered, and the matter is ripe. If, as the OAJC contemplates, Father does not intend to seek adoption by Stepmother, the orphans' court is directed to dismiss the case. Hypothetically, Father could now be divorced from Stepmother, remarried to someone else, and still seek to terminate Mother's rights so that his subse-

quent spouse can adopt L.J.B. There would be no disposition on the merits of the decree before us detailing Father's shameful treatment of his child solely to eliminate Mother from L.J.B.'s life, despite the fact that the instant record, in my view, compels such a result. Due to the OAJC's refusal to address the issue before us and instead, remand, at least five years will have passed since Mother's last contact with L.J.B. The OAJC's mandate is neither necessary nor legally compelled.[10]

The record is clear that the order appealed to us is unsupported by clear and convincing evidence and must be reversed. Stepmother's *ex parte* letter to the court—written six months after the orphans' court entered the decree terminating parental rights—lacks the force and effect of a document filed on the docket. Indeed, if on remand, the orphans' court determines that Father contemplates Stepmother's adoption of L.J.B., the matter will then return to this Court. While under consideration by this Court, should Stepmother once again send a letter suggesting that her misgivings have returned, would we remand the case once more because it has again become "potentially" moot?

The OAJC opines that "the petition for termination of Mother's rights is potentially moot, as it cannot be effected without Stepmother's attendant adoption of L.J.B." OAJC at 16 (citing 23 Pa.C.S. § 2512; *B.E.*, 377 A.2d at 155–56; *T.R.*, 465 A.2d at 644 n. 10; *J.D.S.*, 763 A.2d at 871). By this statement, the OAJC appears to assert that an order terminating parental rights is conditioned upon the subsequent adoption. As the OAJC recognizes earlier in its opinion, however, termination occurs prior to adoption. *See* OAJC at 15 (noting that "[t]ermination of the natural parent's rights

---

**10.** I do not suggest that termination of parental rights may be upheld in the absence of a ready stepparent. Rather, I submit that remanding for further fact-finding at this juncture simply is unnecessary, and it defeats our policy of advancing appeals involving children on a "fast track" basis. Even assuming that merits review would result in an affirmance of the termination decree, there is no impediment to Mother filing a petition with the trial court based upon changed circumstances and obtaining relief upon a proper showing that the prospective adoptive parents are no longer an intact family unit.

**prior to adoption** and allowance of stepparent adoption is for purposes of protecting the integrity and stability of the new family unit" (emphasis added)(quoting *Adoption of J.D.S.*, 763 A.2d at 871)). This two-step process necessarily engenders potential for changed circumstances. Therefore, it follows that whether Stepmother ultimately adopts the child is relevant going forward; however, it is irrelevant for purposes of disposing of the instant appeal.

Moreover, given that courts have the power to enter termination orders regardless of whether a subsequent adoption actually occurs, it seems to me that the propriety of the order is not mooted simply because the stepparent expresses reservation about proceeding with the adoption. We have stated,

> [C]ases presenting mootness problems involve litigants who clearly had standing to sue at the outset of the litigation. The problems arise from events occurring after the lawsuit has gotten under way—changes in the facts or in the law— which allegedly deprive the litigant of the necessary stake in the outcome. The mootness doctrine requires that "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."

*In re Gross,* 476 Pa. 203, 382 A.2d 116, 119 (1978) (quoting Gerald Gunther, *Constitutional Law* 1578 (9th ed.1975)); *see also In re Cain,* 527 Pa. 260, 590 A.2d 291 (1991). In other words, a court must inquire whether "[a] determination . . . of the legal issues tendered by the parties is no longer necessary to compel [a] result, and could not serve to prevent it." *DeFunis v. Odegaard,* 416 U.S. 312, 317, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974).

In the instant case, the result sought by Father was termination of Mother's parental rights. Father obtained this result, the Superior Court affirmed, and Mother sought this Court's review. The fact that Stepmother has indicated she may not proceed with the adoption changes nothing. Indeed, all that was necessary for termination of Mother's parental rights was that Stepmother contemplated adoption throughout the termination proceedings. *See B.E.,* 377 A.2d at 155 (stating that section 312, the predecessor to section 2512, "indi-

cates that a parent may bring a petition for termination of the parental rights of the other parent only when adoption is contemplated"). The record amply supports that this occurred. Accordingly, I fail to see how a determination of the legal issue presented is no longer necessary to compel or prevent the result sought, and obtained, by Father.

This Court should not act upon potentialities set forth in post-appeal "letters" from the parties. There are no jurisdictional impediments to our review of the entry of the decree forming the basis for this appeal, the certified record is not so encumbered, and we have a complete record upon which to conduct our requisite inquiry. A remand for the purpose embraced by the OAJC is unnecessary, fraught with uncertainties, and only serves to stall this appeal in its tracks. Stepmother's musings regarding Father's post-decree treatment of her, while lending credence to reversal of this case on the merits in light of their startling similarity to Father's treatment of Mother, should not serve to postpone what clearly would be accomplished by reversal of the instant decree. Based upon the instant facts, a remand need not and should not occur as it only serves to delay this already protracted litigation.[11]

---

11. It goes without saying that if reversal of the decree concludes the matter, there is neither need nor reason to criticize the orphans' court or order its recusal *sua sponte*. Stepmother's post-appeal wishes will be relevant only if a new petition is forthcoming. Moreover, there is no custody dispute before us presently. If and when such proceedings occur, the parties are free to assert any recusal requests they believe are compelled at that time.